(C. D. 1138)

G. D. SEARLE & Co. v. UNITED STATES

United States Customs Court, First Division

(Decided November 24, 1948)

*Sidley, Austin, Burgess & Harper* (*Walter J. Cummings, Jr.*, and *Edwin C. Austin* of counsel); *Eugene A. Chase*, associate counsel, for the plaintiff.

*David N. Edelstein*, Assistant Attorney General (*Howard L. Harawitz* and *Richard F. Weeks*, special attorneys), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

COLE, Judge: Plaintiff, a pharmaceutical company, imported from Canada Packers, Ltd., of Edmonton, Canada, and entered at the port of Chicago, Ill., in February 1947, a shipment, described on the invoice as "Evaporated Ox Gall," which was classified under the provision in paragraph 5 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 5), as modified by the trade agreement with Argentina, 77 Treas. Dec. 138, T. D. 50504, for "All medicinal preparations of animal origin, not specially provided for," and accordingly assessed with duty at 12½ per centum ad valorem. The assessment followed instructions contained in a ruling by the Commissioner of Customs, 81 Treas. Dec. 202, T. D. 51542 (1), relating to "concentrated oxgall," and stating that the classification of such merchandise under paragraph 5, as modified, *supra*, "will result in the assessment of duty at a higher rate than has heretofore been assessed under a uniform practice."

Plaintiff claims the merchandise is classifiable under paragraph 1669 of the Tariff Act of 1930 (19 U. S. C. § 1201, par. 1669), and free of duty thereunder, as a natural, uncompounded, inedible drug of animal origin, not specially provided for, in a crude state, "not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drug and the prevention of decay or deterioration pending manufacture," and containing no alcohol.

Throughout the testimony, the witnesses have referred to the substance in question either as "concentrated ox gall" or as "inspissated ox gall," and have also used the words "gall" and "bile" interchangeably. The report of the Government chemist (defendant's exhibit 4) describes the imported product as "concentrated ox gall," and in the course of his testimony, said official stated that the terms "concentrated" and "inspissated" are synonymous. In our discussion herein, the merchandise under consideration will be referred to consistently as concentrated ox gall.

The superintendent of the Canadian exporter, who is in charge of the entire plant and who supervised the processing resulting in the imported product, explained the operations and reasons therefor as follows: The gall bag, removed from the livers of the cattle, is opened, and green or fresh gall, amounting to between 4 and 6 pounds per animal, is caught in a pail that is emptied into a tierce and stored until approximately 200 pounds have been accumulated, when it is placed in a steam-jacketed kettle where moisture, down to 25 per centum is evaporated. The resulting material, concentrated ox gall, is put into tierces for shipment. The processing is done in the "inedible part" of the plant. Only 12 to 15 pounds of concentrated ox gall are obtained in a day, so it takes approximately 30 days for a shipping tierce to be filled. Meanwhile, impurities like cattle hair or fat from the rendering plant, dust, and possibly splinters, settle in the open tierces. The concentrated ox gall exported to plaintiff is an uncompounded, inedible substance, containing no alcohol, and the process of concentration helps to prevent decay or deterioration of the fresh gall, saves the cost of freight by reducing the weight to approximately 10 per centum, and also preserves the container.

Testimony of the assistant secretary (purchasing agent) of plaintiff corporation reveals that his company had imported concentrated ox gall, like that in question, for 10 years, during which period it was always admitted free of duty as a crude drug, and that it was not until November 1946, when the ruling of the Commissioner of Customs, T. D. 51542 (1), *supra*, became effective, that classification as a medicinal preparation was invoked.

The vice president in charge of the research department of plaintiff corporation, a qualified chemist whose experience includes considerable

experimental work on ox gall and who is responsible for the development of his company's new products, testified concerning the processing and commercial usage of the imported substance by plaintiff. He analyzed the imported material, using two methods, and described the results of his tests as follows (R. 25):

We had two reports, by different methods on moisture content, one of 9.3 per cent, the other, 10 per cent. On an "as is" basis, which is to say without drying, an alcohol soluble, ether insoluble content of 90 per cent, a water insoluble of 1.7 per cent; cholic acid, determined colorimetrically, of 48 per cent. In addition to that we have a specialized test which we have performed for our own purposes routinely on most of the samples, which is the content of what we call purified cholic acids. That is 53.5 per cent on this sample.

That the total ingredients, as reported, exceed 100 per centum is due to the difficulty, if not impossibility, in making water determinations of this material. The substance is uncompounded and contains no alcohol.

The imported concentrated ox gall is a highly complex mixture, consisting of a wide variety of compounds, some of which have never been identified. The principal constituents, and the ones with which plaintiff is particularly concerned for their therapeutic value in the manufacture of its commercial product, consist of "taurocholic acid, glycocholic acid, a variety of hydroxycholanic acids, in varying combinations, certain partially oxidized cholic acids, both free and combined." The substance, as imported, is an active cathartic, and, being a strong laxative, it is an irritant. It is inedible.

Because it would require disclosure of trade secrets, the witness did not give the entire procedure followed by plaintiff in processing the concentrated ox gall. His testimony, in this connection, shows that the material, in its imported condition, is very viscous so it is diluted to a "usable concentration." After mixing with a determined volume of strong aqueous alkali, the product is subjected to a series of chemical changes, breaking down inherent chemical compounds into their components and isolating the oxidized or keto form of the cholanic acids, ultimately acquired as a "fairly fluffy yellow to white powder" (illustrative exhibit C), the chemical product desired by plaintiff for further pharmaceutical processing into so-called "Ketochol Tablets" (illustrative exhibit F), a commercial product offered by plaintiff as a remedy for biliary disorders, particularly to promote hydrocholeresis, i. e., the formation of a larger volume of a more fluid and less viscous bile than normal.

Concentrated ox gall is simply raw ox gall with some water evaporated therefrom. The concentrated material is used in shipping, principally because the fresh gall undergoes considerable decomposition, becoming easily putrefied and extremely offensive if permitted to stand for a short time. Concentrated ox gall also solves a problem in transportation by the great reduction in the volume of water.

Five physicians, all of whom, in their treatment for biliary disorders, had become familiar with concentrated ox gall, as well as with fresh or green gall, differed little, if at all, in their testimony, as to the therapeutic properties and medicinal use of concentrated ox gall. We summarize their combined testimony—part of the case offered by plaintiff—to find:

Concentrated ox gall is no more than fresh gall with water removed. It is a natural, uncompounded, inedible substance, containing no alcohol. It possesses the same therapeutically valuable ingredients as fresh gall. The inherent therapeutic agents in concentrated ox gall are the bile salts (sodium taurocholate and sodium glycocholate), dehydrocholic acid, cholic acid, and various derivatives and related compounds, which can be effectively administered only after chemical changes or modification in combination with other medicinal ingredients.

Concentrated ox gall is chiefly used in treatment for biliary disorders and diseases of the biliary tract. It also has some use as an enema. The substance is never administered *per se* because the components cause gastrointestinal distress, nausea, and vomiting. A therapeutic dose of this "raw material" would cause the patient to "regurgitate and vomit the material, because of the gastric distress as well as the bitter taste" (R. 120). The concentrated product cannot be used medicinally by mere dilution with water or some inert carrier. It has effective results only when administered in combination with other therapeutic ingredients, i. e., a variety of digestants and mild laxatives.

The testimony of Dr. David Klein, another witness for plaintiff, is highly important in our disposition of the present case, as developed, *infra*. Since 1920, he has been general manager of Wilson Laboratories, whose "main activity is to supply glandular pharmaceutical products to other pharmaceutical houses, who use them as source material for their preparations for physicians and druggists, and the public." He is in charge of production, sales, research, and also the purchase of certain items, among which is ox gall. He identified the concentrated ox gall in question (illustrative exhibit A and exhibit 2), and was familiar with the method of producing it, having done so. In describing the process, substantially the same as hereinabove set forth, the importance of obtaining the proper consistency which the trade, "for the last 26 years at least," has desired at 75 per centum solids, was emphasized. The advantage of such a consistency is "that when this is cooled, it sets. It will not leak. It will not spoil. It requires no refrigeration. It can be kept for years in that form if properly covered so it does not evaporate and become contaminated. With the lower per cent of solids, the material is liquid, and if the tierce should in some way spring a leak, the bile will flow out and become quite a mess, like

we have had experience when material was not concentrated sufficiently high" (R. 229/230).

He has imported ox gall since 1920, but always purchased the concentrated product and never imported fresh ox gall. His reasons for not importing fresh ox gall were stated as follows (R. 233):

It would be very impracticable. In the first place, the bile would have to be collected and kept frozen. Then it would have to be packed in containers in which it could be kept frozen. It would have to be shipped under refrigeration from distant points to the port of entry. In other words, what you would be doing would be shipping kegs of ice, because liquid bile has only a solids content of about 7 or 10 per cent. It has from 93 to 90 per cent water, and you would be shipping mostly water which would have to be frozen. Therefore, you would have this large mass of ice to be shipped from distant ports to the United States. There is always the danger of spoilage along the way.

There is also difficulty in packing fresh gall for shipment. "If the tierces are filled too full and they are frozen, it will happen like a water pipe will burst. They will burst, and if the material is allowed to thaw, it will run over everything" (R. 234). Fresh gall is very perishable. It will putrefy very readily, within 24 hours. Concentrated ox gall is not perishable and need not be kept under refrigeration. The witness' testimony concerning the nature of the merchandise in question, being a natural substance, uncompounded, inedible, and containing no alcohol, is corroborative of that previously presented by plaintiff.

Defendant's evidence does not meet the issue in this case, under prevailing legal authorities, hereinafter discussed. A line of proof was introduced to show how concentrated ox gall is marketed. Three samples of the concentrated substance were produced by a customs agent who obtained one (exhibit 6) from the drug room of the Lenox Hill Hospital in New York City, and purchased the other two from drug stores, one in Chicago (exhibit 7), and the other in New York City (exhibit 8). A biological chemist, employed as chief chemist at Mount Sinai Hospital in New York City, testified concerning the composition and therapeutic value of concentrated ox gall. His testimony is substantially the same as that offered by plaintiff. A practicing physician, specializing in diseases of the stomach and intestines, including ailments of the biliary tract, testified that he administered concentrated ox gall "usually as an enema to stimulate the flow of bile, and as a local irritant to cause the expulsion of gas" (R. 360). The extent of such usage was not shown. For reasons set forth later in this opinion, the form in which the imported substance is ultimately used is not a controlling factor in determining its tariff classification.

The record conclusively shows that the concentrated ox gall in question is a natural substance of animal origin, that it is inedible, uncompounded, containing no alcohol, and that it possesses therapeutic properties and is chiefly, if not exclusively, used for medicinal

purposes. The product is, therefore, a drug, within the statutory definition thereof, paragraph 34 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 34), i. e., "those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes," and as such is more specifically provided for than as a medicinal preparation within the statutory construction announced in *Roche-Organon* v. *United States*, 35 C. C. P. A. 99, C. A. D. 378, decided on January 6, 1948.

Distinguishing the two tariff provisions in the cited case, the Court of Customs and Patent Appeals applied the principle of relative specificity and quoted with approval from *Fink* v. *United States*, 170 U. S. 584, a case that arose under the Tariff Act of 1890, in which the competing provisions were medicinal preparations and chemical salts. There, the merchandise consisted of muriate of cocaine, classified as a chemical salt and claimed to be a medicinal preparation. Having found from the factual situation that the merchandise might be classified under either of the tariff provisions in issue, the Supreme Court in the *Fink* case, *supra*, said:

* * * It would then follow that if either of the paragraphs stood alone in the statute, disembarrassed of the provisions found in the other, the preparation might properly come under the head of either. Being reached, then, in some of its aspects by some of the provisions found in both paragraphs, the question is, which, if either of the two, is so dominant in its control of the article in question as to exclude the operation thereon of the other. The rule is that this, if possible, is to be determined by ascertaining whether one of the two paragraphs is more definite in its application to the article in question than is the other. *Isaac* v. *Jonas*, 148 U. S. 648; *Bogle* v. *Magone*, 152 U. S. 623. Being a medicinal preparation, made as such and solely used as a medicine, the language of paragraph 74 clearly more definitely applies to it than does the generic provision "of chemical compounds and salts" found in paragraph 76. * * * In reason, the result of the certified facts is simply this, that muriate of cocaine is in its narrow aspect a medicinal preparation, in its wider a chemical salt, and hence that chemical salt is a generic term designating all articles of that character, and hence embracing muriate of cocaine as the genus, must as a matter of course contain within itself the species which are embodied in it.

Following the reasoning employed in the *Fink* case, *supra*, the court expressed its conclusion in the *Roche-Organon* case, *supra*, in this way:

It is our view that "medicinal preparations" as used in paragraph 5, *supra*, is a generic term. It includes drugs as the latter term is legislatively defined, but it is broader in scope than drugs, just as in the *Fink* case, *supra*, it was narrower in scope than chemical salts. The Supreme Court defined chemical salts as a "genus" containing medicinal preparations "within itself" as a "species," and held the tariff provision for the species to be more definite than that for the genus. In the instant case we regard "medicinal preparations" as being the genus and "drugs" as being the species.

Under this ruling, the collector's classification of the present merchandise as a medicinal preparation is erroneous. At the same time, we find nothing in the language of said case which restricts the

statutory construction invoked therein to the provision for advanced drugs, as suggested by counsel for defendant in their brief. The appellate court speaks of "medicinal preparations" as the genus, and as "drugs" being the species. The reference to "drugs" is without limitation to any of the kinds of drugs provided for in different paragraphs of the tariff act. The cited case must be construed, as it relates to drugs, just as the statutory definition embraces the term "wherever used in this Act," paragraph 34, *supra*. In other words, the term "drug," whether it applies to crude substances, paragraph 1669, *supra*, or those advanced in condition, paragraph 34, *supra*, or to a finished product, paragraph 23 of the Tariff Act of 1930, is more specific for tariff purposes than the generic term "medicinal preparations."

Classification of merchandise as a drug is dependent upon chief use, as fixed by statutory definition, paragraph 34, *supra*, and it is chief use as of the time of importation that is controlling. *Wilbur-Ellis Co. et al.* v. *United States*, 18 C. C. P. A. 472, T. D. 44762. Chief use as of June 17, 1930, the date of passage of the Tariff Act of 1930, or in October 1941, the time of enactment of the trade agreement with Argentina, T. D. 50504, *supra*, in which the paragraph adopted by the collector was included, is irrelevant and immaterial for the purposes of this case.

Defendant's major premise, set forth in counsel's brief, is:

\* \* \* that a drug in a crude state, as contemplated by paragraph 1669, is one which is not usable *per se* as a medicinal, and that a drug, though crude in form, if usable *per se* for a therapeutic purpose, is dutiable as a medicinal preparation under paragraph 5.

The *Roche-Organon* case, *supra*, is authority for the proposition that an imported product, like the one in question, which falls within the meaning of "medicinal preparations," as that statutory term has been judicially interpreted, and also meets the legislative definition of a drug, is more specifically provided for as a drug. Hence, the testimony hereinabove referred to as to the form of use or method of administration of the present merchandise is of no consequence in determining the issues herein.

The foregoing review of the tariff principles of "relative specificity" and "chief use," with their consequent application herein, eliminates from consideration much proof offered by both parties, including references to several editions of the United States Pharmacopaeia and materials and products listed therein. The condition has developed because the trial of the present case was begun in December 1947, before promulgation of the *Roche-Organon* case, *supra*, which set forth, for the first time, a judicial distinction between two closely related tariff terms, a point not raised by either litigant in the trial

in this court. The record, therefore, reveals both sides offering proof to support a legal premise which, under the cited case, is without foundation. This observation is made in fairness to counsel for both parties, who have presented a complete record, reflecting painstaking efforts for a thoroughly tried case.

The issue herein has been narrowed to the sole question whether the drug, concentrated ox gall, is in an advanced condition, presented as an alternative claim by defendant, or is in a crude state, as alleged by plaintiff.

As is obvious from the foregoing, the record is replete with statements by plaintiff's several witnesses that the concentrated ox gall is nothing more than the green or fresh gall with water removed, and that the concentrated substance contains the same therapeutically valuable constituents as the fresh gall. It is equally clear from the proof that fresh gall is highly perishable, that it easily putrefies, undergoing considerable decomposition in very short time, and that the process of concentration preserves the gall with all its therapeutic properties. The record further discloses that concentrated ox gall is not perishable and requires no refrigeration to remain in its desired condition.

While it is true that fresh ox gall can be shipped under refrigeration, we are persuaded by the testimony that such a procedure is "very impracticable" with a liquid substance, like the fresh gall, having a water content of between 90 and 93 per centum and a solids content of only 7 to 10 per centum. Even when fresh gall would be shipped under refrigeration, the element of spoilage would still be present. The difficulty experienced in transporting masses of ice, existing if fresh gall were shipped, is overcome by the use of the concentrated material. Due to the great reduction in the volume of water, the concentrated substance weighs only 10 per centum of the amount of the fresh gall.

Defendant places much reliance to support its contention on statements by plaintiff's witnesses, elicited during the course of cross-examination, admitting that the removal of water from ox gall is a "step" toward extraction of the therapeutically active bile salts. Such testimony, as it appears herein, cannot be accepted as the principal or controlling reason for concentrating fresh ox gall into the imported concentrated substance. Obviously, liquid bile with a moisture content of 90 to 93 per centum, which the record discloses to be the fact, requires removal of some water to make it available for medicinal use. The quantity evaporated in the process of concentration is not the limited amount intended to be withdrawn to bring the concentrated material to the advanced condition desired for further processing. On the contrary, uncontradicted testimony shows that the

imported substance is in a very viscous condition and requires the addition of water to make it a "usable concentration."

*United States* v. *Judson Sheldon Corp.*, 33 C. C. P. A. 73, C. A. D. 318, held beef liver extract, used for its therapeutic value in the treatment of anemia, malnutrition, and other physical difficulties, to be a crude drug. There, the material was obtained by grinding crude raw or frozen beef livers, and adding water. After heating the mixture to a definite temperature, the water portion was strained off and separated, without clarification, from the coagulated meat portion. The meat portion was further washed with water to recover additional soluble matter. The liquid, resulting from the entire processing, was then concentrated in a vacuum to a solids content of between 55 and 60 per centum, packed in containers, and exported under a temperature of 40° F. Answering the Government's contention that removal of the water and concentration of the valuable vitamin content advanced the drug in condition, the court said:

* * * The record shows that after the arrival in this country, water must be added. It is not illogical to conclude that the removal of the water was the reverse of an advancement, and, in any event, it was not, in our opinion, and we so hold, an advancement by any of the processes mentioned in the statute beyond that which was essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture. Would Congress contemplate that huge cakes of ice containing the thin liquid be shipped here as a crude drug? We think not. It seems clear to us that the extracting of the vitamin-containing, soluble portion of the liver, which is nothing "other than to get it by itself," or, at most, bringing it to a condition where it could be safely packaged and transported, does not remove the drug created by the extraction from its crude condition into one which Congress contemplated would be so advanced by processes applied abroad as to justify its being given a dutiable status.

That language is equally applicable to the present case.

*Geo. S. Bush & Co.* v. *United States*, 32 C. C. P. A. 56, C. A. D. 285, is distinguishable from the present case. There, the imported dogfish-liver oil was obtained from dogfish livers, the crude drugs, through a series of elaborate processes and treatment, resulting in the separation of the oil from water and solids, producing a substance that was 99 per centum pure oil. We are confronted here with an entirely different situation.

The concentrated ox gall in question is a crude drug, not specifically provided for in the tariff act. The processing to which it was subjected in the country of exportation did not advance it in value or condition beyond that essential to the proper packing of the drug and the prevention of decay or deterioration of the same pending manufacture. It is therefore entitled to free entry, under paragraph 1669, *supra*, as claimed.

The protest is sustained and judgment will be rendered accordingly.