(C. D. 1168)

JUDSON-SHELDON CORP. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided March 25, 1949)

*Eugene R. Pickrell* for the plaintiff.

*David N. Edelstein,* Assistant Attorney General (*Howard L. Harawitz* and *Harold L. Grossman,* special attorneys), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges

CLINE, Judge: This is a protest, arising at the port of New York, against the collector's assessment of duty on frozen beef livers imported from Argentina on October 15, 1945, at the rate of 3 cents per pound under paragraph 706 of the Tariff Act of 1930, as modified by the trade agreement with Canada, T. D. 49752, as edible animal livers, frozen. It is claimed that the merchandise is free of duty under paragraph 1669 as a crude drug of animal origin or is dutiable at 10 per centum ad valorem under paragraph 34 as a drug advanced in value or condition.

The pertinent provisions of the tariff act are as follows:

PAR. 706 [as modified by T. D. 49752]. Edible animal livers, kidneys, tongues, hearts, sweetbreads, tripe, and brains, fresh, chilled, or frozen, 3¢ per lb., but not less than 15% ad val.

PAR. 1669. Drugs such as barks, * * * and all other drugs of vegetable or animal origin; all the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, and are in a crude state, not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture:

*Provided,* That no article containing alcohol shall be admitted free of duty under this paragraph. [Free.]

PAR. 34. Drugs, such as barks, * * * and all other drugs of vegetable or animal origin; any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, 10 per centum ad valorem: *Provided,* That the term "drug" wherever used in this Act shall include only those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes: *And provided further,* That no article containing alcohol shall be classified for duty under this paragraph.

## SEC. 306. CATTLE, SHEEP, SWINE, AND MEATS—IMPORTATION PROHIBITED IN CERTAIN CASES.

(a) RINDERPEST AND FOOT-AND-MOUTH DISEASE.—If the Secretary of Agriculture determines that rinderpest or foot-and-mouth disease exists in any foreign country, he shall officially notify the Secretary of the Treasury and give public notice thereof, and thereafter, and until the Secretary of Agriculture gives notice in a similar manner that such disease no longer exists in such foreign country, the importation into the United States of cattle, sheep, or other domestic ruminants, or swine, or of fresh, chilled, or frozen beef, veal, mutton, lamb, or pork, from such foreign country, is prohibited.

(b) MEATS UNFIT FOR HUMAN FOOD.—No meat of any kind shall be imported into the United States unless such meat is healthful, wholesome, and fit for human food and contains no dye, chemical, preservative, or ingredient which renders such meat unhealthful, unwholesome, or unfit for human food, and unless such meat also complies with the rules and regulations made by the Secretary of Agriculture. * * *

(c) REGULATIONS.—The Secretary of Agriculture is authorized to make rules and regulations to carry out the purposes of this section, and in such rules and regulations the Secretary of Agriculture may prescribe the terms and conditions for the destruction of all cattle, sheep, and other domestic ruminants, and swine, and of all meats, offered for entry and refused admission into the United States, unless such cattle, sheep, domestic ruminants, swine, or meats be exported by the consignee within the time fixed therefor in such rules and regulations.

## Section 111 of Title 21, U. S. C., provides:

The Secretary of Agriculture shall have authority to make such regulations and take such measures as he may deem proper to prevent the introduction or dissemination of the contagion of any contagious, infectious, or communicable disease of animals and/or live poultry from a foreign country into the United States or from one State or Territory of the United States or the District of Columbia to another, and to seize, quarantine, and dispose of any hay, straw, forage, or similar material, or any meats, hides, or other animal products coming from an infected foreign country to the United States, or from one State or Territory or the District of Columbia in transit to another State or Territory or the District of Columbia whenever in his judgment such action is advisable in order to guard against the introduction or spread of such contagion. (Feb. 2, 1903, ch. 349, § 2, 32 Stat. 792; Feb. 7, 1928, ch. 30, 45 Stat. 59.)

Pursuant to the authority granted in the above statutes, the following regulations were issued by the Secretary of Agriculture:

ORDER TO PREVENT THE INTRODUCTION INTO THE UNITED STATES OF RINDERPEST AND FOOT-AND-MOUTH DISEASE [B. A. I. Order 373]

\* \* \* \* \* \* \*

SEC. 94.1. *Existence of rinderpest or foot-and-mouth disease; importations prohibited.*—Notice is hereby given that I, PAUL H. APPLEBY, Acting Secretary of Agriculture, have determined that the contagious and communicable disease of rinderpest or of foot-and-mouth disease exists in the following foreign countries: \* \* \* Argentina, \* \* \*; and I have so officially notified the Secretary of the Treasury. Wherefore, the importation into the United States of cattle, sheep, or other domestic ruminants or swine (including the entry into any port of the United States of any vessel having on board as sea stores such animals from the above-named countries) or of fresh, chilled, or frozen beef, veal, mutton, lamb, or pork, from the countries above named, is prohibited. (Sec. 306, 46 Stat. 689; 19 U. S. C. 1306.)

\* \* \* \* \* \* \*

SEC. 94.3. *Organs, glands, extracts, or secretions of ruminants or swine.*—No fresh, chilled, or frozen organs, glands, extracts, or secretions derived from domestic ruminants or swine, originating in any country named in section 94.1, shall be entered into the United States except for pharmaceutical purposes. (Sec. 2, 32 Stat. 792; 21 U. S. C. 111.)

\* \* \* \* \* \* \*

PART 95—SANITARY CONTROL OF ANIMAL BYPRODUCTS (EXCEPT CASINGS), AND HAY AND STRAW, OFFERED FOR ENTRY INTO THE UNITED STATES [B. A. I. Order 371]

\* \* \* \* \* \* \*

REGULATION 17

SEC. 95.17. *Glands, organs, ox gall, and like materials; requirements for unrestricted entry.*—Glands, organs, ox gall or bile, bone marrow, and various like materials derived from domestic ruminants or swine, intended for use in the manufacture of pharmaceutical products, which do not meet conditions or requirements specified in paragraph (*a*) or (*b*) following, shall not be imported except subject to handling and treatment in accordance with section 95.18 of this order:

(*a*) Such glands, organs, or materials may be imported without other restriction if originating in and shipped directly from a country not declared by the Secretary of Agriculture to be infected with foot-and-mouth disease or rinderpest.

(*b*) Such glands, organs, or materials may be imported without other restriction if accompanied by the certificate of a consular officer showing that in process of preparation the particular product was subjected to a temperature of not less than 156° F. (68.9° C.).

REGULATION 18

SEC. 95.18. *Glands, organs, ox gall, and like materials; importations permitted subject to restrictions.*—Glands, organs, ox gall or bile, bone marrow, and various like materials derived from domestic ruminants or swine, which do not meet the requirements of section 95.17 of this order may be imported for pharmaceutical purposes if in tight containers and consigned to an approved establishment: *Provided, however,* That upon special permission of the Chief of Bureau they may be stored for a temporary period in approved warehouses under bond and under

the supervision of an inspector. They shall be handled and processed at the said establishment in a manner approved by the Chief of Bureau and the containers shall be destroyed or disinfected as prescribed by him. They shall not be removed therefrom except upon special permission of the Chief of Bureau and upon compliance with all the conditions and requirements of this section relative to the movement of the said glands, organs, ox gall, and like materials from the port of arrival to the said establishment.

At the trial Dr. Jasper P. Scott, a chemist, testified that he was employed by Eli Lilly & Co. as a research chemist in the field of biological chemistry from 1920 to 1930, as Assistant Director of Research Development from 1930 to 1946, and as Director of Industrial Engineering from 1946 to date; that the company is engaged in the manufacture of pharmaceuticals and biologicals to be administered by physicians; that the merchandise herein was purchased from Sociedad Anonima "La Blanca" which is an American-owned plant located near Buenos Aires; that he had seen frozen beef livers produced in this country and in American-owned plants in Argentina; that the same process is used in both countries; that the viscera of the animal are dropped from the killing floor onto the floor below into pans which are on a movable conveyor flowing under streams of water; that the livers and other usable products are removed by operators; that they are then taken into cooling chambers where they remain overnight; that they are then transferred to the sharp freezer which is maintained at a temperature of about zero degrees Fahrenheit; that the livers will freeze in from 4 to 8 hours; that the hard-frozen livers, which have the appearance of rocks, are then packed into water-tight barrels for shipment.

Truman D. Hoover, who was employed as a research chemist in glandular products by Eli Lilly & Co. from 1924 to 1930, and since 1930 as superintendent of the Glandular Products Department, testified that he saw the merchandise herein when it arrived at the plant of Eli Lilly & Co. in Indianapolis; that an inspector of the United States Bureau of Animal Industry was present when the car containing the merchandise was opened; that the merchandise was packed in large, leak-proof barrels called tierces; that the beef livers arrived in good condition, hard-frozen at the time the barrels were opened; that the inspector examined the barrels to see that there was no leakage, and then passed them for unloading and processing; that he inspected the handling of the livers to see that they were not improperly handled, exposing people or equipment to contact with the material; that he followed the containers and saw that they were destroyed by burning.

Mr. Hoover stated further that Eli Lilly & Co. operates under a permit from the United States Bureau of Animal Industry to process livers for pharmaceutical purposes; that after the beef livers herein were removed from the barrels they were ground in a hammer mill, then went through a meat chopper, and next into an extraction tank

containing water and sulphuric acid where they were heated for about 2½ hours, after which the material was filtered, precipitating the residue of the beef liver from the extract; that the water extract was evaporated to a sirup of 45 per centum solids; that the sirup was used for the manufacture of liver-stomach concentrate by mixing it with whole hogs' stomachs which have been ground through a meat chopper, digested for about 4 hours at body temperature, then dried, defatted, and powdered; that that is called an anti-anemia powder which is mixed with different iron preparations; that a product known as Lextron 66 is manufactured from the anti-anemia powder, ferrous sulphate, and Vitamin $B_1$; that Lextron 55 is manufactured the same way except that a different iron is used; that Extralin is a mixture of anti-anemia powder, plus a fraction of liver, a little more highly purified, which has been digested with stomach.

Mr. Hoover testified further that in compliance with regulations, the areas where the liver is processed and the equipment are washed with a solution of 2 per centum sodium hydroxide or 2 per centum caustic solution; that all the equipment with which the livers come in contact and the areas where the containers have been moved are washed with a 2 per centum sodium hydroxide solution; that the workmen do not wear rubber gloves.

Mr. Hoover stated also that the preparations described as Lextron 66, Lextron 55, and Extralin are delivered in containers to the Pulvule Filling Department where the material is placed in capsules, which are put up in bottles and packaged in another department. Samples of Lextron 66, Lextron 55, and Extralin in capsules were received in evidence as plaintiff's collective illustrative exhibit B.

On cross-examination Mr. Hoover testified that the imported livers were no different, as to appearance, from beef livers produced in this country; that beef livers are meats; that he made no analysis to determine whether the imported beef livers were infected with any disease; that he did not know whether they were infected with foot-and-mouth disease, rinderpest, or anthrax; that as far as he knew they were not denatured nor did they have any adulterant in them; that all that had been done to them was to freeze them.

James W. Murdoch, a doctor of veterinary medicine, employed by the United States Bureau of Animal Industry since 1911, testified that he was familiar with B. A. I. Orders 371 and 373 (plaintiff's collective illustrative exhibit A); that those orders were in effect in 1945; that the frozen beef livers involved herein were disposed of in accordance with the said orders; that the Eli Lilly plant at Indianapolis was an approved establishment under B. A. I. Order 371 during 1945.

Dr. Murdoch stated also that he had had experience with foot-and-mouth disease in cattle in the 1914–15 outbreak and the 1924 outbreak; that he inspected cattle that had the disease; that such cattle

were appraised, slaughtered, and buried, and not used for human consumption; that foot-and-mouth disease is a virus disease; that heat will neutralize the virus in a liver extracted from a cow infected with the disease; that the disease is not prevalent among humans; that prepared meat products imported from Argentina are permitted entry for human consumption, but that raw, fresh, or frozen meat products from that country are distinctly prohibited.

Cecil W. Clark, a pharmacist employed by Eli Lilly & Co. since 1930 as a salesman and sales manager, testified that he had sold Lextron 66, Lextron 55, and Extralin to wholesale drug houses, hospitals, drug stores, and dispensing physicians.

Dr. Paul J. Fouts, a practicing physician, testified that he was consultant on hematology in the Lilly Clinic of Medical Research from 1931 to 1942 and from 1945 to date; that he is engaged in the practice of internal medicine in Indianapolis; that he has administered to human beings the three preparations in plaintiff's collective illustrative exhibit B; that they were used in the treatment of pernicious anemia and related anemias; that the 40 to 45 per centum solids extracted from the frozen beef livers covered by this protest contained a substance having therapeutic properties, namely, the liver anti-anemic principle; that this substance is found naturally in beef livers. He also testified that foot-and-mouth disease is a virus; that the disease in humans is a mild disease characterized by blisters or ulcers in the mouth and about the hands and feet; that he had never treated a case of foot-and-mouth disease in a human; that it is rare in this country. He stated that in his opinion beef livers from cattle infected with foot-and-mouth disease could be used as food when properly cooked; that proper cooking is cooking to a temperature which would prepare the meat for eating purposes; that he was more concerned with the handling of the livers as regards possible infection; that in one case report which he had read a patient developed foot-and-mouth disease following a splinter in his hand from a meat block.

It was stipulated by counsel for the parties herein—

* * * that the frozen beef livers which are the subject of the instant protest are in all respects identical with the frozen beef livers which were imported under entry number 713868 and are the subject of Protest Number 126736–K, and that testimony as to the analysis and testing of the frozen beef livers involved in Protest Number 126736–K, entry number 713868, may be offered and received in evidence with the same force and effect as if said analysis and testing were made of the merchandise at bar.

It was also stipulated:

* * * that on October 25, 1945 sampler Joe Weiss, an employee of the United States Government, proceeded to the cold storage plant in Jersey City where the merchandise covered by entry number 713868 was stored, and after having duly identified the shipment, had several tierces therefrom produced.

One tierce was opened, and one liver removed by Mr. Weiss, who brought said liver immediately to Mr. Zeiger, at the Appraiser's Stores. It was received by Mr. Zeiger on October 25, 1945 still in its frozen condition.

\*          \*          \*          \*          \*     .     \*          \*

We further stipulated that the sample delivered to Mr. Zeiger was one whole liver weighing 8 to 10 pounds, out of an importation of 210 tierces weighing 73,513 pounds.

The Government called Arthur Zeiger, examiner of merchandise, who testified that he had examined the livers in entry number 713868 of protest number 126736–K; that he delivered a sample therefrom to Herman Arrow in the customs laboratory; that after it had been thawed out, it was a full, plump, chocolate-mahogany-colored liver, with no specks; that after it was delivered to Mr. Arrow, it was put on a stove to steam; that it gave off a very appetizing, typical liver odor; that after the liver had been steamed it became a dark-reddish color; that it had been cooked completely through; that after it had been thoroughly cooked, Mr. Arrow and the witness ate some; that it was as good as any liver he had ever eaten; that he had no ill effects after eating it; that he ate about an ounce of it; that he touched it with his hands, did not wear gloves, nor treat his hands with antiseptic; that he might have had cuts on his hands.

Herman Arrow, chemist in the United States Customs Laboratory in New York, testified that he had received a frozen beef liver from Mr. Zeiger; that he placed three-quarters of it in an enamel pan on a steam bath and kept one-quarter of it at room temperature; that during the time the pieces were thawing he looked for objectionable odors, but noticed nothing amiss; that there was no odor of decomposition, nor of kerosene, nor of oil, nor was there any chemical odor; that he made chemical tests to detect the presence of alkaloids, boric acid, salicylic acid, the preservatives and antiseptics sometimes found in meat, sulphuric acid, borax, formaldehyde, kerosene, oil, and narcotics; that he found none of those present; that he tested for ethyl alcohol and found none present. He also stated that he cooked the three-quarter piece at 80 degrees centigrade or 176 degrees Fahrenheit for about 3 hours; that it was steamed clear through; that after it had been cooked he ate some of it; that the liver was identical with normal beef livers which he had observed at home; that he ate at least half a pound; that he felt no ill effects; that Mr. Zeiger and some of the men in the laboratory also ate some; that they did not seem to suffer any ill effects; that he handled it with his hands, did not wear gloves, and did not use any antiseptic; that he did not have any cuts on his hands.

Plaintiff contends that the merchandise herein is not frozen, edible beef livers within the purview of paragraph 706 of the Tariff Act of 1930, as modified by T. D. 49752; that that paragraph does not

include frozen livers imported from a country in which the Secretary of Agriculture has found rinderpest or foot-and-mouth disease prevalent; that the importation of such livers is prohibited except for pharmaceutical purposes; that such beef livers are inedible; that they are free of duty as crude drugs under paragraph 1669. The Government contends that the merchandise is edible animal livers, frozen.

The chief issue, therefore, is whether or not the merchandise was edible within the meaning of paragraph 706, as modified. The word "edible" has been defined as "Suitable to be eaten; eatable" (Funk & Wagnalls New Standard Dictionary) and as "fit to be eaten as food; especially applied to objects which are habitually eaten by man, or specifically fit to be eaten, among similar things not fit for eating" (28 Corpus Juris Secundum 830). No other or different meaning of the term has been found applicable in tariff cases. *United States* v. *Paul Puttmann*, 21 C. C. P. A. 135, T. D. 46466; *United States* v. *Yick Shew Tong Co.*, 25 C. C. P. A. 255, T. D. 49392.

The case last cited involved certain Chinese nuts or seeds, fruits, and lily bulb scales which were split and dried. It was held that they were classifiable under paragraph 1669 as crude drugs, even though such products had been eaten without any deleterious effects. The court said (p. 268):

*   *   * Many articles whose drug character is indisputable doubtless can be eaten in moderation without deleterious results. The word edible, we think, must be given its common meaning and construed in the sense of its ordinary use and acceptance. *   *   *

   *      *      *      *      *      *      *

In view of the *use* which is shown of the products here involved, we do not regard them as being edible in the common and usual understanding of that term. [Italics supplied.]

Under the definition in paragraph 34 of the Tariff Act of 1930, classification of an article as a drug is dependent upon its chief use. *G. D. Searle & Co.* v. *United States*, 21 Cust. Ct. 112, C. D. 1138. Such use is to be determined as of the date of importation or immediately prior thereto. *Wilbur-Ellis Co.* v. *United States*, 18 C. C. P. A. 472, T. D. 44762; *W. J. Lake & Co., Inc.* v. *United States*, 27 C. C. P. A. 247, C. A. D. 94.

At the time of importation of the within merchandise, the Secretary of Agriculture under the authority granted him by section 306 of the tariff act and 21 U. S. C. § 111 had found that foot-and-mouth disease was prevalent in Argentina and had prohibited the importation of fresh, chilled, or frozen organs, including beef livers, except for pharmaceutical purposes. The merchandise herein, frozen beef livers, could not have been imported except for pharmaceutical purposes and the record shows that it was in fact used in the manufacture of drugs. It was therefore not edible within the common and usual meaning of the term.

Statutes which relate to the same subject matter or have the same purpose or object are *in pari materia* and are to be construed together. *United States* v. *Babbit*, 66 U. S. 55; *United States* v. *A. W. Faber, Inc.*, 16 Ct. Cust. Appls. 467, T. D. 43211; *Oxford University Press, N. Y., Inc.* v. *United States*, 33 C. C. P. A. 11, C. A. D. 309. In the instant case, paragraph 706 of the tariff act, as amended, section 306 of said act, section 111 of title 21, U. S. C., and the regulations issued thereunder, all relate to beef livers, among other things. Construing these provisions together, there appear to be two classes of beef livers provided for: (1) Edible beef livers and (2) beef livers from countries where foot-and-mouth disease is prevalent and which may be imported only for pharmaceutical purposes. Whether the latter are in fact edible or not would thus be immaterial. Since they are substances having therapeutical properties and are crude and chiefly used for medicinal purposes (as they cannot be imported for any other purpose), they are properly free of duty as drugs in a crude state under paragraph 1669.

In *F. W. Myers & Co., Inc.* v. *United States*, 29 C. C. P. A. 30, C. A. D. 167, the merchandise belonged to the classification of edible beef livers, since it was imported from a country in which foot-and-mouth disease had not been found to be prevalent and was not inedible in fact. It was thus immaterial that they could not be legally used for human consumption because of the lack of a certification which could have been obtained on application. For this reason, the court stated that there could be no distinction between beef liver which was edible in fact and that which was edible only by reason of law.

In the instant case the merchandise belongs to the class which could be imported only for pharmaceutical purposes. Logically, therefore, it is free of duty under the crude drug paragraph.

*United States* v. *Judson Sheldon Corp.*, 33 C. C. P. A. 73, C. A. D. 318, involved beef liver extract imported from Brazil. The merchandise was obtained by grinding the livers and extracting the liquid, which was then concentrated in a vacuum to a solids content of between 55 and 60 per centum and placed in containers for shipment. The protein material and valuable vitamins associated with the insoluble or fat portion were retained in Brazil as food for both humans and animals. There was testimony that it would have been impractical to import whole livers because they would have to be kept in a frozen condition and it would be difficult to obtain freezer space. It was held that the merchandise was a crude drug made from beef liver.

The court rejected the Government's contention that the beef liver itself was the crude drug on the ground that it was edible, of the kind that is used both here and in Brazil for food purposes. The

court mentioned certain testimony as to the fact that beef livers from Brazil might not be imported except for pharmaceutical purposes, but did not discuss or pass upon the effect of the prohibition. The court concluded that in the processes carried on in Brazil the crude drug first appeared when the soluble portion of the liver was extracted. It stated, however (p. 79):

By the language used in the last quoted sentence it is not meant to suggest that this court would or would not entertain a different view or arrive at a different conclusion if the livers from which the instant extract was taken had in fact been a crude drug. Upon the instant record it is not necessary for us to further discuss this phase of the case.

In view of the statutes and regulations applicable in the instant case, it must be held that the liver in the instant case is the crude drug, since it could not have been imported or used, and was not in fact used, for any purpose other than the preparation of a pharmaceutical.

We hold, therefore, that the merchandise herein is entitled to free entry under paragraph 1669 of the Tariff Act of 1930, as a crude drug of animal origin. The protest is sustained and judgment will be rendered accordingly.