(C. D. 1246)

KACHURIN DRUG COMPANY *v.* UNITED STATES

United States Customs Court, First Division

(Decided May 31, 1950)

*Eugene R. Pickrell* (*Eugene R. Pickrell* and *Michael Stramiello, Jr.*, of counsel) for the plaintiff.
*David N. Edelstein*, Assistant Attorney General (*John J. McDermott* and *Richard E. Weeks*, special attorneys), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges; MOLLISON, J., dissenting

COLE, Judge: Plaintiff, as purchasing agent for the American Pharmaceutical Co., imported for its principal "36 cases of Sulfichton." The commodity is chemically known as ammonium ichthosulfonate. It possesses therapeutic properties and is chiefly used for medicinal purposes, and therefore is susceptible of classification either as a medicinal preparation or as a drug. *Roche-Organon, Inc.* v. *United States*, 35 C. C. P. A. 99, C. A. D. 378.

The collector classified the merchandise under paragraph 5 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 5),[1] as a medicinal preparation, obtained naturally or artificially, and not specially provided for, and accordingly assessed duty at 25 per centum ad valorem. Plaintiff claims that the substance is classifiable either as a drug advanced in condition, within the meaning thereof in paragraph 34 of

[1] PAR. 5. All chemical elements, all chemical salts and compounds, all medicinal preparations, and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for, 25 per centum ad valorem.

the Tariff Act of 1930 (19 U. S. C. § 1001, par. 34),[2] carrying a duty assessment of 10 per centum ad valorem, or as a medicinal preparation of animal origin, not specially provided for, dutiable at 12½ per centum ad valorem under paragraph 5 of the Tariff Act of 1930, as modified by the trade agreement with Argentina, 77 Treas. Dec. 138, T. D. 50504.

The following might be accepted as a fair analysis of the testimony making up the record.

Marvin Weiss, chemist in charge of the control laboratory of the said American Pharmaceutical Co., received the imported commodity and made a chemical analysis thereof. Because of the presence of impurities, lowering the quality below requirements of the National Formulary, an official compendium recognized in the Federal Food, Drug and Cosmetic Act, 21 U. S. C. (1946 ed.) §321, the substance could not be used in its imported condition. The purifying processes that followed consisted of treatment with ammonium hydroxide, ammonium sulfide, and a light kerosene fraction. The ammonium hydroxide and the ammonium sulfide precipitated iron- and other metal-producing substances. The light kerosene fraction removed the ash and water and glycerin insolubles, the water solution being filtered and then evaporated to a sirupy consistency.

Following such processing, further tests were given, and if the results continued to show an inferior product, then additional purifying materials were blended therewith to meet the standards of the National Formulary, *supra*, to permit packing into tubes, bottles, jars, or pails, or fabricated into an ointment by mixing with lanolin and petrolatum, in which conditions it is sold to pharmaceutical manufacturers or retail pharmacists who dispense it as a remedy for skin diseases. It is never administered *per se*, but always combined with ingredients, to be taken as a pill or suppository, or applied as an ointment.

The imported product is of organic origin "because on consumption there is a volatile residue that burns with a sooty flame and a high carbon content remains behind in the ash which usually signifies organic material." It is said not to be of mineral origin because analysis did not reveal any inorganic impurities.

Frederick W. Ziffer, a well-qualified chemist, is director of laboratories for the said American Pharmaceutical Co., whose duties in-

---

[2] PAR. 34. Drugs, such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of vegetable or animal origin; any of the foregoing which are natural and uncompounded drugs and not> dible, and not specially provided for, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, 10 per centum ad valorem: *Provided*, That the term "drug" wherever used in this Act shall include only those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes: *And provided further*, That no article containing alcohol shall be classified for duty under this paragraph.

cluded supervision of the analyses of the present importation. During the course of 20 years' experience in Austria, where he received his education and was manager of several chemical plants, he observed the production of ammonium ichthosulfonate, like the substance in question (plaintiff's exhibit 1), in Seefeld, Tyrol, Austria.

He described its production. Bituminous schists, consisting of comparatively soft brown to black oily material, are mined in primitive fashion out of shallow pits about 100 yards in the mountainside. The schists are in seams, about 2 to 4 inches wide, imbedded in rock, usually limestone, and start from the ground, following the seams between the rocks. The bituminous material contains the remains of "fossilized fishes, crayfish, shells and other marine life together with minerals." Upon removal from the pits, it is rolled to the size of a nut, loaded in cast-iron retorts, and heated in kilns, producing a "dark, brown, rather evil smelling oil" that is cooled and collected in coil condensers. "The mineral parts of the schists remain in the retort as a kind of a coke." The crude oil thus obtained is treated with sulfuric acid and neutralized with ammonia, and finally concentrated to proper consistency.

Dr. E. Frank Weiswasser, a practicing physician, testified that ammonium ichthosulfonate contains therapeutic value through organic sulfur contained therein; that he has prescribed it for external application only, as a remedy for boils, blood poisoning, and inflammation of the legs due to varicose veins; and that it is never administered alone but always in combination with a carrier or filler to reduce its strength and avoid irritating effect to patients.

Bella Kahn, Government chemist who analyzed the imported merchandise, was defendant's sole witness. Her testimony concerning the ingredients and method of production of ammonium ichthosulfonate is in substantial agreement with plaintiff's, but is contradictory thereof in that she regards the product as of mineral origin and not a natural substance, but a chemically compounded one.

Customs litigation, presenting competition between paragraphs 5 and 34, *supra*, as they provide for medicinal preparations and drugs, respectively, has been too infrequent to completely cover the realm of each class of merchandise. This case is demonstrative of that. It embodies a most interesting discussion which the briefs look upon as requiring extensive reference to dictionaries and encyclopaedias for explanation and clarification of statutory language. We do not regard such an approach as necessary herein. The issues are simple and admittedly limited.

Government counsel, during the course of the trial, stated: "The whole issue here is whether this shale is animal origin or mineral origin and the Government's position in the case is that it is of mineral origin * * *." Later, counsel again emphasized defendant's

position with this statement: "The Government's position is that the shale and the merchandise produced is from mineral origin * * *. The whole issue is what the origin of the shale or schists is, mineral, animal or vegetable origin."

Counsel for plaintiff, in his brief, concedes that the commodity in question is a medicinal preparation in its therapeutic properties and chief use for medicinal purposes. Whether the admission can be carried to the extent of limiting the issue solely to the question of origin, may be questionable, but as our discussion of pertinent authorities proceeds in conjunction with established facts and statements contained in the elaborate briefs by respective counsel, little difficulty is experienced in determining a definite classification for the product in question.

It follows from the foregoing that prime consideration should be given to the question of origin. In cases where the issue concerned classification of a substance as a drug or a medicinal preparation, the natural source of the commodity has been consistently recognized as its origin. *United States* v. *Judson Sheldon Corp.*, 33 C. C. P. A. 73, C. A. D. 318; *Sherka Chemical Co., Inc.* v. *United States*, 33 C. C. P. A. 53, C. A. D. 316; *Roche-Organon, Inc.* v. *United States*, 35 C. C. P. A. 99, C. A. D. 378; *G. D. Searle & Co.* v. *United States*, 21 Cust. Ct. 112, C. D. 1138.

The *Judson Sheldon Corp.* case, *supra*, concerned beef liver extract; the *Sherka Chemical Co., Inc.*, and *Roche-Organon, Inc.*, cases, *supra*, related to hormones; and the *Searle & Co.* case, *supra*, involved concentrated ox gall. In all of the cases, the primary cause or first existence of the therapeutic agent was taken as its origin. Raw or crude livers were recognized as the origin of the beef liver extract, held to be a crude drug in the *Judson Sheldon Corp.* case, *supra*. The origin of the hormones, classified as advanced drugs in the *Sherka Chemical Co., Inc.*, and *Roche-Organon, Inc.*, cases, *supra*, was the urine of pregnant mares through which the therapeutic substances were excreted. In the *Searle & Co.* case, *supra*, the gall bag, removed from the livers of cattle, was shown to be the origin of the concentrated ox gall, held to be a crude drug.

By the same reasoning in this case, the bituminous schists where the therapeutic element—organic sulfur—originally existed, are to be accepted as its origin. The record shows that the bituminous schists are substantially wholly animal matter, and that the mineral matter is lost in destructive distillation to obtain crude oil. As organic sulfur, which imparts therapeutic value to the imported product, is derived from the natural material and remains present throughout the processes discussed, *infra*, the merchandise in question must be regarded basically as of animal origin.

While the cited cases can be favorably compared on the issue of origin, there is a vital distinction between them and the present one

in final determination of classification. In all of the said cases, the imported drug was the same as the substance found in its natural existence. Such is not true of the product under consideration. To break down the commodity before us to the point equal to the status of the beef liver extract, the hormones, and the concentrated ox gall involved in the cited cases, would require acceptance of the crude oil, obtained through distillation of the natural bituminous schists, as the merchandise to be classified herein.

But ammonium ichthosulfonate, the imported product, is not crude oil. It is a definite chemical product, possessing a therapeutic element of animal origin, and is manufactured from distilled oil that has been treated with sulfuric acid, neutralized with ammonia, and dialyzed to remove water-soluble salts and to reduce the ash content for final concentration to the desired consistency. Counsel for plaintiff in his brief concedes that sulfonating and neutralizing the schist oil caused "a chemical reaction, which produced a new substance," ammonium ichthosulfonate.

It is not a natural product but one artifically produced. Treating the distilled oil with sulfuric acid, developed one chemical combination, and then neutralization thereof with ammonia produced another substance. The combined treatment conforms to the common meaning of "compound," i. e., "to make up by intermingling or intimate combination of various elements or ingredients; combine or intermix so as to form a composite product." (Funk & Wagnalls New Standard Dictionary.)

The processes produce a "compound" within the interpretation given in *United States* v. *Davies, Turner & Co.*, 5 Ct. Cust. Appls. 196, T. D. 34325, wherein the court said that "There must be some artificial mixture of chemicals or artificial compounding of substances to produce a chemical compound."

That the present merchandise is compounded and artificially produced, removes it from classification as a drug under paragraph 34, *supra*, which specifically provides that substances shall be "natural" and "uncompounded."

The *Sherka Chemical Co., Inc.*, case, *supra*, cited by plaintiff to support its position, is distinguishable. There, the therapeutic alpha-oestradiol existed in the imported solution in the form as extracted from its original source. Here, a manufactured chemical product, with a therapeutic agent giving it medicinal value, has been manufactured.

The ammonium ichthosulfonate in question is a medicinal preparation with a therapeutic element of animal origin, and as such is specifically provided for in paragraph 5, as amended, *supra*, dutiable thereunder at 12½ per centum ad valorem, as claimed.

The protest is sustained and judgment will be rendered accordingly.

DISSENTING OPINION

MOLLISON, Judge: I am unable to agree with the conclusion of my colleagues in this case that the imported ammonium ichthosulfonate is properly classifiable as a medicinal preparation of animal origin. I agree with so much of the majority opinion herein which finds that the imported substance is not classifiable as a drug, and which finds that it is classifiable as a medicinal preparation. As it appears that the merchandise is not otherwise specially provided for outside of the medicinal preparations provisions of the act, the question to be determined is whether it is a medicinal preparation of animal origin or of other than animal origin.

In the determination of the origin of the imported medicinal preparation, the majority has recognized the natural source thereof as its origin. That source it has named as certain bituminous schists, which schists it finds, upon some statements made in the record, to be "substantially wholly animal matter." I cannot agree with this latter finding.

"Schist" is defined in Webster's New International Dictionary (2d ed., 1945) as—

*Petrog.* Any metamorphic crystalline *rock* having a closely foliated structure * * * and hence admitting of division along approximately parallel planes. [Italics mine.]

"Rock" is defined in the same authority as—

3. *Geol.* Solid *mineral* matter of any kind occurring naturally in large quantities or forming a considerable part of the earth's mass; also, a particular mass or kind of such material. Rock may be consolidated or unconsolidated, and composed of one mineral or, more commonly, of two or more; or it may be to a greater or less extent of organic origin, as coal. [Italics mine.]

It may well be, as indicated by the record, that the bituminous schists from which the importation at bar was made contain the remains of fossilized fish or other marine animals, and that the schists themselves were largely of animal origin, and that the sulfur contained therein, which forms the therapeutic element of the imported product, retained its organic nature. *None of these facts alter the basic fact that the butuminous schists are regarded in common usage, as shown by the above definitions, as mineral matter and not as animal matter.* It must be remembered that it is the origin, i. e., the natural source, of the *imported product*, ammonium ichthosulfonate, in which we are interested, *not* the origin of the bituminous schists.

To my mind, the term "medicinal preparations of animal origin," as found in the modification of paragraph 5 contained in the Argentine Trade Agreement, T. D. 50504, was intended to cover preparations made from the blood, organs, parts, etc., of contemporary animals, not of fossilized or petrified or wholly or partly mineralized prehistoric animals which today have no existence as animals.

If the term "animal origin," as found in the trade agreement, *supra*, be considered to be ambiguous or doubtful, then this view finds corroboration in the "Digests of Trade Data," etc., issued by the United States Tariff Commission in connection with the Trade Agreement between the United States and Argentina (Washington 1942). As stated in the foreword, that volume—

\* \* \* consists of digests of information concerning products on which concessions were granted by the United States in the trade agreement with the Argentine Republic, signed October 14, 1941.

and goes on to state that—

The material presented has been drawn from the detailed data made available by the Tariff Commission, prior to, and during, the negotiations with Argentina, to the Trade Agreements Committee, which is the interdepartmental body charged with carrying out the trade agreements program. \* \* \*.

Such information is proper to be considered where there is ambiguity in the language used in the trade agreement in question. *United States* v. *Good Neighbor Imports, Inc.*, 33 C. C. P. A. 91, C. A. D. 321.

On page 181 of that volume, under the caption "Medicinal Preparations of Animal Origin" and the subheading "Description and uses," I find the following:

Medicinal preparations of animal origin include glandular medicinals and other pharmaceutical products obtained from various animal organs. These preparations are used chiefly for supplying glandular deficiencies or for correcting other organic disorders of the human body. Pituitary, thyroid, and pancreas gland extracts are the principal glandular medicinals; liver extracts, gall preparations, urine concentrates, and corpus luteum are the chief medicinal products other than of glandular origin in this classification. The most important medicinal preparation of animal origin imported from Argentina is one derived from mare serum, used in the manufacture of sex hormone preparations.

I am satisfied that the product at bar is properly classifiable under the provision for medicinal preparations in paragraph 5 of the tariff act and not under the modification thereof by the Argentine Trade Agreement, *supra*.