UNITED STATES *v.* KACHURIN DRUG COMPANY (No. 4657) [1]
KACHURIN DRUG COMPANY *v.* UNITED STATES (No. 4658)

---

[1] C. A. D. 459.

United States Court of Customs and Patent Appeals, June 5, 1951

*David N. Edelstein,* Assistant Attorney General (*Joseph F. Donohue,* special attorney, of counsel), for the United States.

*Eugene R. Pickrell* (*Michael Stramiello, Jr.* of counsel) for Kachurin Drug Company.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Associate Judges

O'CONNELL, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, First Division, entered pursuant to its decision, C. D. 1246. There the court held that 36 cases of imported sulfichton, chemically known as ammonium ichthosulfonate, and commercially known as ichthyol,[1] were properly classifiable, as claimed in appellee's protest, as medicinal preparation of animal origin, not specially provided for, under paragraph 5 of the Tariff Act of 1930, and dutiable thereunder at 12½ per centum ad valorem, the modified rate provided by the Trade Agreement with Argentina, 77 Treas. Dec. 138, T. D. 50504.

The collector classified the merchandise under the same paragraph as a medicinal preparation, obtained naturally or artificially, not specially provided for, and assessed the duty accordingly at 25 per centum ad valorem.

A cross-appeal filed by appellee against the judgment of the Customs Court, claiming in its assignment of errors, that the merchandise should have been classified and assessed with duty at 10 per centum ad valorem, as a drug advanced in value, or condition, under the provisions of paragraph 34 has been withdrawn, and the cross-appeal was dismissed April 10, 1951, as noted on the Record of the court, page 3992.

The fundamental issue is whether the imported merchandise is of animal origin, as held by the Customs Court, or of mineral origin dutiable at 25 per centum ad valorem, as asserted by the Government here and in the court below. A dissenting opinion by Judge Mollison of that court held that the goods should have been classified and

---

[1] See *Cassett* v. *United States,* 2 Cust. Ct. Appls. 465, T. D. 32225.

assessed with duty at 25 per centum ad valorem under the provision for medicinal preparations in paragraph 5 of the act, and not under the modification thereof by the trade agreement with Argentina, on the ground that the merchandise had its origin in bituminous schists and was not of animal origin.

The pertinent paragraph of the Tariff Act of 1930 reads as follows:

Par. 5. All chemical elements, all chemical salts and compounds, all medicinal preparations, and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for, 25 per centum ad valorem.

The Trade Agreement with Argentina (T. D. 50504) modified the above rate as follows:

All medicinal preparations of animal origin, not specially provided for . . . 12½% ad valorem.

The evidence establishes that in limited localities of Russia and the Austrian Tyrol there are shale pits of bituminous schists which contain large quantities of organic material. From that material the crude oil here in issue was distilled. Dr. Frederick W. Ziffer, with respect thereto and on behalf of the importer, explained in his direct testimony before the trial court:

Q. Now will you describe what you saw in the preparation of this crude oil? A. In Seefeld, Tyrol, there are shallow pits where bituminous schists have been mined for at least a hundred years. It was kind of a local industry. The schists are taken out of the pits and rolled over a small crusher and are broken into pieces about nut size.

Chief Judge Oliver: What is a schist?

A. It is a bituminous material which contains plenty of organic material either of botanical or animal origin, just as bituminous coal contains remains of fossilized plants, so bituminous schists contain plenty of fossilized marine life, fish; you will find entire fish six feet long looking like a tuna fish and shells, crayfish and other remains.

  *   *   *   *   *   *   *

Q. You are referring to the schists that you actually saw and observed and are referring to what they contained from your observation? A. Yes. The schists contained the remainder of fossilized fishes, crayfish, shells and other marine life together with minerals.

Judge Cole: How can you tell that from mere observation—just looking at it?

A. From the process of distillation. The remains of the fossilized fish can be seen. As I said before you sometimes find the entire bodies of the fossilized fish. You find impressions of cray fish and shells imbedded and when it is loaded into cast iron retorts and heated in kilns the oil evaporates from this material—from those bituminous schists. It is cooled and collected in coil condensers and is a dark, brown, rather evil smelling oil. The mineral parts of the schists remain in the retort as a kind of a coke. The oil is treated with sulfuric acid, neutralized with ammonia and then concentrated to the correct consistency. That's the process which I actually saw.

Q. Now Doctor, is the merchandise which you saw produced over there the same in all material respects to the merchandise the subject of this protest? A. Identical in all respects.

The organic sulphur distilled from the crude oil is the therapeutic ingredient contained in the instant merchandise which, after importation, is analyzed, purified, and blended to meet the required standards of the National Formulary. The product thus defined is admixed with lanolin and petrolatum by retail druggists and pharmaceutical manufacturers and the preparation administered as ointment, pills, or suppositories in the treatment of human ailments, including skin diseases.

The court below properly held that the recognized natural source or first existence of a drug or therapeutic element must be taken as its origin.[2] The court below also held, and it is here conceded, that the imported ammonium ichthosulfonate is a compounded medicinal preparation of which the therapeutic element is the organic sulphur hereinbefore described. Furthermore, there is no dispute that fish as the source of a therapeutic element is an animal.

The trial court found that the mineral matter contained in the original schists was lost therefrom in the destructive distillation process to obtain the crude oil; that the schists thus retained their organic nature and consisted "substantially wholly" of animal matter; that the organic sulphur derived from the natural material was present from the beginning and remained throughout the process of its production and hence must be regarded as basically of animal origin obtained from the animal, fish.

The record discloses that the merchandise is a carbon compound, and an organic substance, the therapeutic element of which is organic sulphur. The position taken by Judge Mollison in his dissenting opinion and advanced here by counsel for the Government is based upon their view that the merchandise was of mineral origin, having been obtained by the mining of the bituminous schists in which the merchandise was occluded, and not of animal origin, although obtained indirectly from the occluded fish wherein the therapeutic element was an original ingredient.

We are here concerned not with the origin of schists but with the origin of the organic sulphur obtained from the fish occluded in the schists. Fish are organic and schists are frequently inorganic. Although the schists in the case at bar were mined, the merchandise in issue which was extracted thereform is obviously not a mineral in the true sense of the word.

The judgment of the United States Customs Court, for the reasons stated, is *affirmed.*

---

[2] See *Roche-Organon, Inc.* v. *United States,* 35 C. C. P. A. (Customs) 99, C. A. D. 378; *United States* v. *Judson Sheldon Corp.,* 33 C. C. P. A. (Customs) 73, C. A. D. 318; *Sherka Chemical Co., Inc.* v. *United States,* 33 C. C. P. A. (Customs) 53, C. A. D. 316; *G. D. Searle & Co.* v. *United States,* 21 Cust. Ct. 112, C. D. 1138.