(C. D. 1147)

CIBA PHARMACEUTICAL PRODUCTS, INC. v. UNITED STATES

United States Customs Court, First Division

(Decided December 15, 1948)

*Eugene R. Pickrell* for the plaintiff.
*Charles J. Miville*, Acting Head, Customs Division (*Richard E. FitzGibbon*, special attorney), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

COLE, Judge:  Tariff classification of merchandise, either as a drug or a medicinal preparation, is controlled by identical factors, i. e., therapeutic qualities and medicinal use.  The statute, paragraph 34 of the Tariff Act of 1930 (19 U. S. C. §1001, par. 34), defines a drug as a substance "having therapeutic or medicinal properties and chiefly used for medicinal purposes."  By judicial interpretation, *United States* v. *Hillier's Son Co.*, 14 Ct. Cust. Appls. 216, T. D. 41706, the provision for medicinal preparations has been limited to articles whose chief use is for medicinal purposes.  The similarity between the two provisions was discussed in *United States* v. *Wm. Cooper & Nephews, Inc.*, 22 C. C. P. A. 31, T. D. 47038, wherein the appellate court said: "Both medicinal preparations and drugs, according to the statutory meaning of those terms, have therapeutic or medicinal properties, and both must be used for the prevention, cure, or alleviation of bodily disease of either man or animal."

*Roche-Organon, Inc.* v. *United States*, 35 C. C. P. A. 99, C. A. D. 378, distinguished between the two closely allied statutory designations, holding the provision for "drugs" to be more specific than the one for "medicinal preparations."  It follows therefrom that when a product falls within the judicial interpretation of a medicinal preparation, and also meets the statutory definition of a drug, the commodity is properly classifiable as a drug.  The importance of this decision in the disposition of the present case is clear.

Here, the merchandise consists of blood platelets, assessed with duty at 12½ per centum ad valorem under the provision in paragraph 5 of the Tariff Act of 1930 (19 U. S. C. §1001, par. 5), as modified by the trade agreement with Argentina, 77 Treas. Dec. 138, T. D. 50504, for "All medicinal preparations of animal origin, not specially provided for."  Plaintiff contends for classification as a drug, either free of duty under paragraph 1669 of the Tariff Act of 1930 (19 U. S. C. §1201, par. 1669), as being in a crude state, or dutiable at 10 per centum ad valorem under paragraph 34, *supra*, as having been advanced in condition.

Four witnesses testified.  Three are associated with plaintiff, a corporation engaged in manufacturing ethical medicinal products.

The chief chemist, who supervises manufacturing operations, including activities of the analytical control laboratories, described the procedure followed in acquiring the merchandise under consideration, having observed the process several times in Switzerland, the country of exportation of the blood platelets in question. The pharmacist in charge of the ampoule department, who supervises manufacture of bulk ampoule solutions, explained the treatment applied in his department to the imported substance, and its combination with other agents in a preparation sold by plaintiff. The manager of sales of pharmaceutical preparations testified concerning the commercial distribution and use of the product, in which the imported blood platelets are marketed. From the testimony offered by plaintiff's employees, it is fair to accept the following factual summation:

The blood platelets in question are natural constituents of steers' blood, extracted therefrom for their coagulant properties. Fresh blood, withdrawn immediately after slaughter, is collected in a container holding an anticoagulant, generally Epsom salts. Because the whole blood coagulates so readily, the process for recovery of the desired blood platelets is undertaken on the day of withdrawal from the animals. First, the blood is mixed in a volume of alcohol, six or eight times in excess of itself. The alcoholic extract is concentrated under a vacuum, the alcohol being distilled off and replaced with some water. The aqueous extract is mixed with ether, the ether layer separating over night. The blood platelets are precipitated with the use of acetone, and then redissolved in ether. (Ether is used twice, as above outlined, to "prevent deterioration.") The solution is evaporated under a vacuum, and after a purifying process, with the use of chloroform, the crude coagulen is evaporated dry, producing the imported substance, a dark brown powder (exhibit 1), which, upon receipt in plaintiff's plant, is kept under refrigeration at a temperature below 30° F., to prevent it from becoming "rancid with age."

Following importation, and before the merchandise is accepted for use, the blood platelets are subjected to a chemical test for ingredients and a biological test for potency as a coagulator, to determine whether the substance meets certain specifications fixed by plaintiff as standard. When the Quality Control Laboratory is satisfied, through said tests, that the merchandise conforms to requirements, i. e., "Ciba Specifications," it becomes available for further manipulation with a Tyrode solution, into plaintiff's finished product.

The Tyrode solution embodies the mineral constituents of blood, consisting of the chemical salts, in quality and quantity, as they exist in human blood. The Tyrode solution possesses medicinal properties. "It provides for acid alkali balance in the blood, and it provides additional calcium which is one of the functions in the coagulation of blood" (R. 39–40). It makes the coagulen isotonic and prevents osmosis.

A definite quantity of the Tyrode solution is combined with a weighed amount of blood platelets, and the mixture is packed in ampoules. "Coagulen ampoules are tested for sterility, tested microscopically and are tested in the chemical laboratory for pH, and in the biological laboratory they are tested for decrease in coagulation time." (R. 14.) Having passed the required tests, the coagulen ampoules are packed under the label "Coagulen-Ciba" (illustrative exhibit A), which plaintiff sells to hospitals, wholesale druggists, and medical departments of industrial organizations, offering it as a remedy to decrease bleeding in surgery, in internal hemorrhages, and in dental practice.

Plaintiff also introduced a practicing physician, specialist in gynecology and general surgery, who testified that since 1930 he had been administering blood platelets, always in combination with a Tyrode solution, for their coagulant properties, chiefly in children's tonsillectomies and also, under certain conditions, in hemorrhages of women. His description of the therapeutic effect of blood platelets is as follows (R. 81): "When the blood platelets are in solution, injected into the body, it forms a substance which we speak of as thrombokinase. The thrombokinase acts upon the prothrombin which is present in the bloodstream in the presence of calcium, forming a substance called thrombin. The thrombin in turn is an activator of the fibrinogen present in the blood, producing the fibrin, or causing the clotting of blood." The therapeutic value of the Tyrode solution was explained in this way: "It acts as a solvent for the blood platelets, which in turn in that solution can be taken up by the body. It is isotonic with the blood. It is isotonic with the plasma in which it is injected. It helps to bring the substance, the substance which is formed from the blood platelets, to the site of injury for which we are injecting. It maintains an osmotic pressure in the solution so that the solution is absorbed by the cell." (R. 82.)

Defendant argues that it was the burden of plaintiff to establish that the chief use of bovine blood was for medicinal purposes, and as the record is void of such proof, a claim for classification as a drug cannot be sustained. The contention has no merit.

The issue herein does not relate to blood. The merchandise under consideration is admittedly blood platelets, conceded to be a natural ingredient of steers' blood. What tariff classification the whole blood may have, is immaterial for the purposes of this case.

The uncontradicted testimony before us is conclusive in showing that the present merchandise possesses therapeutic properties and is exclusively used for medicinal purposes. It is a natural, uncompounded substance of animal origin, that is inedible and contains no alcohol. Under the construction announced in the *Roche-Organon* case, *supra*, the commodity is a drug, the determinative question for

definite classification being whether it is in a crude state, or advanced in condition.

*Vandegrift & Co.* v. *United States,* 13 Ct. Cust. Appls. 30, T. D. 40865, related to certain cattle glands and organs, dried and ground into powdered form, and used for their therapeutic properties in the manufacture of solutions of hypodermic injection. On a record establishing that the drying and grinding processes were essential in the preparation of the drugs to prevent decay or deterioration pending manufacture for their medicinal uses, the merchandise was held to be, for tariff purposes, in a crude state.

In holding beef liver extract, obtained by grinding and other processing of raw or frozen beef livers to obtain vitamins of therapeutic value, to be a crude drug, the court, in *United States* v. *Judson Sheldon Corp.,* 33 C. C. P. A. 73, C. A. D. 318, said:

> \* \* \* It seems clear to us that the extracting of the vitamin-containing, soluble portion of the liver, which is nothing "other than to get it by itself," or, at most, bringing it to a condition where it could be safely packaged and transported, does not remove the drug created by the extraction from its crude condition into one which Congress contemplated would be so advanced by processes applied abroad as to justify its being given a dutiable status. See *United States* v. *Sheldon & Co.,* 2 Ct. Cust. Appls. 485, T. D. 32245. In some respects that case is easily distinguishable from the one at bar, but in other respects it is very much in point, particularly that portion dealing with the degree of *crudeness.*

The reasoning followed and conclusion reached in the cited cases have equal application to the present merchandise. These blood platelets retain the crudest form in which the substance can be imported, without affecting the desirable therapeutic agent. The commodity is extracted from its natural source (animals' blood) by a process of isolation through which every precaution is taken to insure against decay, deterioration, or disintegration of active medicinal properties. Nothing was done except to get blood platelets by themselves. The merchandise was not advanced in value or condition; its crudeness, as contemplated by paragraph 1669, *supra,* remained constant.

Recognized lexicographic authorities support this conclusion. Hackh's Chemical Dictionary defines blood platelets as follows (p. 134): "Thrombocytes. A structural element of the blood containing cytozyme which is essential in stopping bleeding by coagulating the blood. It is a commercial product (*e. g.,* Coagulen Ciba)." "Practical Physiological Chemistry" by Hawk & Bergheim (11th ed., 1937) has this to say on the "Composition of Blood": "Blood consists of a fluid portion, the plasma, and of formed elements. The latter include the erythrocytes, leucocytes, and platelets, and constitute about 40 per cent by volume and about 50 per cent by weight of the whole blood." The same volume (p. 390) describes blood platelets as "round or oval colorless discs which possess a diameter about one-

third as great as that of the erythrocytes," and states that they "are associated with the coagulation of the blood." Thorpe's Dictionary of Applied Chemistry (1927 ed., Vol. 1) discusses blood platelets as an element for coagulating the blood as follows: "The subject of blood clotting has been the battlefield of numerous opposing theories, but the view now generally held is that the conversion of fibrinogen into fibrin is due to the action of an enzyme called thrombin or fibrin-ferment. This agent takes origin from the platelets and white corpuscles; it is first shed out from them in an inactive form called thrombogen; thrombogen is converted into the active enzyme thrombin by the combined action of the calcium salts of the plasma and of an activating agent termed thrombokinase which originates from the cells of the blood itself and of the other tissues of the body."

Plaintiff's undisputed evidence, supported by the cited judicial authorities and the foregoing quotations from prevailing text books on the subject, establishes for the blood platelets in question, a tariff classification as a crude drug under paragraph 1669, *supra*, and free of duty thereunder, as claimed.

The protest is sustained and judgment will be rendered accordingly.