(C. D. 1253)

BIOLOGICAL RAW PRODUCTS CO. *v.* UNITED STATES

United States Customs Court, First Division

(Decided June 20, 1950)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Edward N. Glad* of counsel) for the plaintiff.

*Davis N. Edelstein,* Assistant Attorney General (*John J. McDermott,* special attorney), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

COLE, Judge: *Vandegrift & Co.* v. *United States,* 13 Ct. Cust. Appls. 30, T. D. 40865, concerned certain ovarian and pituitary cattle glands containing active ingredients used by drug manufacturers. While the fresh gland was most desirable, it could not be safely transported from Argentina, the country of exportation, unless continuously frozen prior to the time of use. Lack of sufficient refrigerator space, when required, made shipment of the fresh glands impractical. The only feasible method of transporting the glands, to retain the valuable therapeutic substances, was to dry and grind them, and ship them in powdered form. The drying and grinding processes were found by the court to be essential for proper packing and to prevent decay or deterioration pending manufacture. Accordingly, the merchandise was held to be classifiable as a crude drug, as

(1)

the importer had claimed, rather than an advanced drug, as assessed by the collector.

The same issue was presented in *G. D. Searle & Co.* v. *United States*, 21 Cust. Ct. 112, C. D. 1138. There, the merchandise consisted of concentrated ox gall used for treatment of biliary disorders and diseases of the biliary tract. The substance was obtained from the gall bag after its removal from the livers of cattle. The green or fresh gall is highly perishable, easily putrifies, and undergoes considerable decomposition in very short time. To preserve its medicinal value, the substance was subjected to a heating process through the medium of a steam-jacketed kettle in which the moisture content of 90 to 93 per centum was reduced to 25 per centum. The quantity evaporated was not limited to the amount intended to be withdrawn to bring the concentrated material to the advanced condition desired for further processing. On the contrary, following importation, water had to be added to give the substance a usable concentration. We found, as a matter of fact, that the imported concentrated ox gall was no more than fresh gall with water removed, that it contained the same therapeutically valuable constituents as the fresh gall, and that the treatment applied prior to importation did not advance the substance beyond a crude state within the contemplation of the statute. The conclusion reversed the collector's classification as an advanced drug and sustained one for crude drug, claimed by the importer.

The cited cases are controlling of the present one, involving the identical issue. Here, the merchandise consists of dried brains of bovine animals, classified as an advanced drug under paragraph 34 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 34),[1] carrying a duty assessment of 10 per centum ad valorem, and claimed to be free of duty as a crude drug under paragraph 1669 of the Tariff Act of 1930 (19 U. S. C. § 1201, par. 1669).[2]

Under the fundamental principle that the collector's action carries the presumption that he found every fact essential to the classification

---

[1] PAR. 34. Drugs, such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of vegetable or animal origin; any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, 10 per centum ad valorem: *Provided*, That the term "drug" wherever used in this Act shall include only those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes: *And provided further*, That no article containing alcohol shall be classified for duty under this paragraph.

[2] PAR. 1669. Drugs such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, logs, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of vegetable or animal origin; all the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, and are in a crude state, not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process of treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture: *Provided*, That no article containing alcohol shall be admitted free of duty under this paragraph.

adopted by him, *United States* v. *Albers Bros. Milling Co.· et al.*, 35 C. C. P. A. (Customs) 119, C. A. D. 380, it follows that the substance in question meets the statutory definition of a drug, paragraph 34, *supra*, thereby limiting the issue to the question whether the imported commodity was advanced in condition, as assessed, or crude, as claimed.

Three witnesses testified on behalf of plaintiff, i. e., the managing director of the foreign exporter who has been familiar with· the product for 12 years, an employee of the importing company who saw the merchandise at the time of arrival in this country, and the manufacturing chemist of Ciba Pharmaceutical Products Co. that used the imported material in the manufacture of drug products. Defendant offered no proof. Plaintiff's undisputed evidence supports the following factual foundation.

The natural brain from the bovine animal, being 80 per centum water, will deteriorate very readily if not maintained under refrigeration or preserved in an acceptable manner. A recognized preservative method is known as the spray process to which the merchandise in question was subjected.

The raw or fresh brain is fed to a rapidly rotating disc that scatters the material into a large chamber, 12 to 15 feet in diameter, with circulating hot air, thus removing the moisture and collecting the resulting bead-like forms at the bottom of the chamber for conveyance into bins or drums.

The sole purpose of the spraying process is to remove water from the natural brain, thereby preventing deterioration and preserving the therapeutic cholesterol (i. e., a substance contained in nerve tissue, blood, bile, etc.), extracted after importation and used in making "various hormones which might be described as male hormones, testrones, or female hormones, projestron, which are ingredients of our drugs." The processing effects no chemical change in the substance. In no way is it advanced in condition. On the contrary, there is a disadvantage in having the finer product because it clouds the screen or filter in manipulating the material after importation to acquire the desired cholesterol.

Counsel for defendant, in their brief, cite several cases containing reference to the term "crude" and its statutory use. None of them, however, follows the reasoning or applies an interpretation different from what is to be found in the *Vandegrift & Co.* and *G. D. Searle & Co.* cases, *supra*. The cases cited by defendant are briefly reviewed.

*United States* v. *Danker & Marston*, 2 Ct. Cust. Appls. 522, T. D. 32251, which arose under the Tariff Act of 1897, cited with approval *Roessler & Hasslacher Chemical Co.* v. *United States*, 94 Fed. 822, and *Leber & Meyer* v. *United States*, 135 Fed. 243, presented under the Tariff Act of 1894. All of the cases concerned merchandise classified by

the collector as a nonenumerated manufactured article. The importer in each instance invoked a provision for articles in a crude state used in dyeing. In sustaining the importer's claim, the court found that the merchandise was chiefly used for dyeing purposes, and that the processing in the country of exportation did nothing to change the character of the imported article to remove it from the crude state.

The importance of the three cases, just referred to, is their adherence to the established principle that "the term 'crude,' as used in tariff legislation, is a relative term, its meaning depending upon its use in the context." *United States* v. *Richard & Co.*, 8 Ct. Cust. Appls. 304, T. D. 37583.

The rule was applied in *Perry Ryer & Co.* v. *United States*, 2 Ct. Cust. Appls. 374, T. D. 32096, which defendant contends—and we agree—is applicable to the present case. There, the merchandise consisted of young fustic dyewood obtained from a shrub or small tree grown in the Mediterranean countries. The roots and branches, containing the valuable dyeing properties, were generally gnarled, irregular, and jagged in shape, so before shipment they were reduced in size by a process of cutting or shredding and then packed in coarse burlap sacks, the condition in which they were imported. Some of the merchandise was imported while the Tariff Act of 1897 was in effect, and the remainder under the Tariff Act of 1909. The distinction is important because the provision under which importer's claim was based was materially changed when enacted in the later act of 1909. Paragraph 548 of the Tariff Act of 1897 provided for "woods used expressly for dyeing; * * * in a crude state, and not advanced in value or condition by refining or grinding, or by other process, * * * ." In the subsequent Tariff Act of 1909, paragraph 559 thereof contained a similar provision reading "woods used expressly for dyeing or tanning; * * * in a crude state, not advanced in value or condition by any process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture: * * * ." The court's decision clearly emphasizes the distinction. After holding that paragraph 559, *supra*, by its broad and unqualified language, removed the shredded dyewood from classification as crude material, the effect of the comparatively limited scope of paragraph 559, *supra*, was stated as follows:

. However, as to those importations which were entered under the tariff act of 1909 a much more serious question presents itself. Under the applicable paragraphs of that act the corresponding provisions relating to advancement in value or condition are not so comprehensive and unqualified as are those of the former acts. Quite to the contrary, an advancement of such dyewood in value or condition by any process or treatment does not alone deny the article free entry if such advancement is essential to the proper packing of the wood or the prevention

of decay or deterioration pending manufacture. * * * A new element is thus introduced into the paragraph which was not before the board in the case above cited, relating to like importations under the act of 1894. * * *

The language, originally appearing in said paragraph 559 of the Tariff Act of 1909, which fixed the meaning of the word "crude," has been used in all subsequent tariff legislation—paragraphs 27 and 477 of the Tariff Act of 1913; paragraphs 34 and 1567 of the Tariff Act of 1922; paragraphs 34 and 1669 of the Tariff Act of 1930—controlling classification of certain kinds or classes of drugs, and has been given liberal construction as evidenced in the *Vandegrift & Co.* and *G. D. Searle & Co.* cases, *supra*. Application thereof to the present issue warrants the same conclusion as that reached in the said two cases, for the processing prior to importation of the dried brains under consideration, like that done to the glands classified in the *Vandegrift & Co.* case, *supra*, and the concentrated ox gall, subject of the *G. D. Searle & Co.* case, *supra*, did no more than to prevent deterioration and preserve the active medicinal principles for ultimate use in the manufacture of drugs in this country.

*Sherka Chemical Co., Inc.* v. *United States*, 33 C. C. P. A. 53, C. A. D. 316, which defendant quotes at length in its brief, contains no reference to the word "crude," or to relative crudeness of the imported merchandise, which consisted of hormones in solution. The issue was whether the commodity was a chemical compound under paragraph 5 of the Tariff Act of 1930, as assessed, or a drug advanced in condition, under paragraph 34, *supra*, as claimed. The case does not seem to be a proper subject for discussion herein.

Cases cited by defendant in which the court found merchandise to be advanced in condition were based on facts showing that the treatment prior to importation produced a new article, more valuable than the crude material, and capable of immediate use for its intended purpose. This was true in *Togasaki & Co. et al.* v. *United States*, 12 Ct. Cust. Appls. 463, T. D. 40667, and *Ishimitsu Co.* v. *United States*, 12 Ct. Cust. Appls. 477, T. D. 40672, which concerned Japanese foodstuffs that had been prepared in the country of exportation to the point where they were fit for their only use. The powdered opium involved in *Merck* v. *United States*, 151 Fed. 14, resulted from processes that destroyed the identity of the crude substance and produced another article, new in its use and new in its commercial signification.

The dried brains, subject of the present litigation, have not reached the status of any of the advanced products classified in the cases cited in the foregoing paragraph. The therapeutic substance, existing as cholesterol in the present merchandise, has the same medicinal value in the imported commodity as it did in the raw material. It attains no commercial value until after extraction from its imported condition, through processing by the manufacturer in this country.

The imported drug is in a crude state, as contemplated by the statute, and entitled to free entry under paragraph 1669, *supra*, as claimed. The protest is sustained and judgment will be rendered accordingly.