(C. D. 1270)

DR. HALFDAN HEBO *v.* UNITED STATES

United States Customs Court, First Division

(Decided September 7, 1950)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Edward N. Glad* of counsel) for the plaintiff.

*David N. Edelstein*, Assistant Attorney General (*John J. McDermott*, special attorney), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

COLE, Judge: Plaintiff, whose business is the preparation of glandular and hormone products for pharmaceutical purposes, im-

ported a substance consisting of processed suprarenal glands. The collector classified the merchandise as a medicinal preparation of animal origin, under paragraph 5 of the Tariff Act of 1930, as amended by the trade agreement with Argentina, 77 Treas. Dec. 138, T. D. 50504, and accordingly assessed duty at 12½ per centum ad valorem. Plaintiff claims that the commodity is a drug, either advanced in condition, dutiable at 10 per centum ad valorem, under paragraph 34 of the Tariff Act of 1930 (19 U. S. C. § 1001, par 34),[1] or in a crude state and therefore free of duty under paragraph 1669 of the Tariff Act of 1930 (19 U. S. C. § 1201, par. 1669).[2]

When the case was reached for trial, Government counsel abandoned the classification adopted by the collector, and conceded that the merchandise is a drug, claiming it to be in an advanced condition and dutiable under said paragraph 34. While the admission makes the protest good, plaintiff stresses the claim for classification as a crude drug under paragraph 1669, *supra.*

Government counsel's concession that the collector's classification is erroneous removes any presumption of correctness ordinarily attached to such official action, so as we review the evidence, it will be considered free from any influence usually attached to the collector's classification.

Plaintiff described a suprarenal gland as "a little appendix at the kidney of beef cattle and hogs and that gland is removed in the packing plants." Based on personal observation of the process followed in the plant of the Danish exporter of the present merchandise, the witness testified that the glands are put through an ordinary meat chopper and then dehydrated in an oven at a temperature of approximately 60 degrees centigrade. During the course of dehydration, a fatty layer, surrounding the material, is removed, exposing the gland to air that facilitates drying and creates a condition for proper preservation of the substance. The soluble mixture thus obtained is removed and packed in moistureproof containers. In this case, paper bags lined with parchment were used.

[1] PAR. 34. Drugs, such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of vegetable or animal origin; any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, 10 per centum ad valorem: *Provided,* That the term "drug" wherever used in this Act shall include only those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes: *And provided further,* That no article containing alcohol shall be classified for duty under this paragraph.

[2] PAR. 1669. Drugs such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, logs, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of vegetable or animal origin; all the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, and are in a crude state, not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture: *Provided,* That no article containing alcohol shall be admitted free of duty under this paragraph.

Preservation by freezing is another method of shipping these suprarenal glands with their desired therapeutic agent. Using ice will preserve the material for a limited time only. Maintaining the substance at a temperature of 40 degrees below zero will keep the gland for a year.

In its imported condition, the merchandise was a coarse, brown, fibrous powder, "more like a piece of felt," that could easily be taken apart. It is incapable of use as imported and must be further processed to obtain effective application of its therapeutic agent. Extraction of the medicinal element was described by plaintiff as follows:

\* \* \* The active ingredient there is water soluble and the water is solidified with a little bit of hydrochloric acid and what is known as 1/10 normal and that is about 104% and it is better to use ascorbic acid. It must be done to reduce the oxygen. Hormones are sensitive to oxidation. The extraction is simple. You soak powder in water which has been solidified and then remove the water in a centrifuge or filter, and then it is good to have further distillation by placing in a vacuum or you can use aretone and water and concentrate that and keep on concentrating until you get a crystalline powder which is then known as adrenalin and that is then used for injecting in the skin. It is frequently used in connection with novacaine, morphine, narcotics.

Dr. Bray, a practicing physician, corroborated plaintiff's testimony to the effect that the drug in question, in its imported condition, is useless. The active principle, adrenalin or epinaphrene (the terms are synonymous), must be reduced to solution for administration by hypodermic as a medicinal to increase blood pressure or "to take down excessive redness or limitation of the blood vessels or to stop bleeding."

Testimony of two chemists, who appeared on behalf of defendant, does not contradict this proof. On the contrary, there is substantial agreement among all that the processing—dissection and then dehydration—of these suprarenal glands to their imported condition was solely for preservation of their medicinal value. An important phase of defendant's proof, favorable to plaintiff's claim, is the statement by the Government witness, Applezweig, to the effect that although dissection causes loss of some of the properties of suprarenal glands, the process is a definite form of preservation. The value of the testimony is in showing that chopping the glands does not advance their condition as drugs. Defendant's witness, Marbardie, gave the following favorable comment concerning the treatment applied to the present merchandise: "I would say it is not good procedure to dry the glands without chopping them first because the glands are usually covered with a layer of fat and if they are chopped before drying the moisture in the gland doesn't get a chance to escape."

Defendant's claim that the merchandise is an advanced drug is based on an assumption that these suprarenal glands were subjected to a grinding process following dissection and dehydration. Government counsel, in direct examination of his witnesses, presumed that

the merchandise had been ground into powder form and obtained supposititious testimony, as in the following statement, "If that grinding was done after the material was properly dissected, if that grinding was done after the material was dissected, I would say it was a further process" and not necessary to preserve the glands from decay or deterioration. The record, however, is void of any positive proof to support the Government's contention.

The capable customs examiner, who advisorily classified the imported commodity, testified that "it is my recollection that this merchandise was in a powdered form, yellowish brown, something like the appearance of brown sugar; in that it wasn't a free flowing powder; it appeared to be somewhat lumpy but it definitely looked like what we might call powder." This description is not evidence of a grinding process which, as defendant contends, brought the drug to an advanced condition within the meaning of paragraph 34, *supra*.

Neither party produced a sample of the imported substance. The necessity therefor, however, is relieved by the similarity in description of the commodity by plaintiff and the customs examiner. The former called it a fibrous powder, like a piece of felt; the latter said it is a lumpy, not a free-flowing powder.

It is the characterization of the material as "powder," upon which defendant has predicated its entire case, as emphasized by the following language in counsel's brief:

In the instant case, as the record, *supra*, indicates, the involved merchandise was not only chopped and dehydrated but was reduced to a powder, which powder enhanced the value of the product by converting it into a form adaptable for the manufacture of pharmaceutical products. While the record, *supra*, seems to indicate that the chopping of the suprarenal glands is an aid to the preservation of the glands, this situation does not apply to the grinding of the said glands into powder since the strong, *positive testimony of the government witnesses*, *supra*, clearly points out that the grinding into powder has no bearing on the preservation of the suprarenal glands. [Italicized words ours.] ·

As previously set forth, there is no "positive testimony of the government witnesses," to show that the present merchandise was subject to the grinding process that defendant has presumed to have been done.

Government counsel, in their brief, present a lengthy discussion concerning the term "crude" and its use in the tariff sense. The line of argument and the citations given are the same as those offered by the same attorneys in *Biological Raw Products Co*. v. *United States*, 25 Cust. Ct. 1, C. D. 1253, wherein dried brains of bovine animals were held to be crude drugs. It would unduly lengthen this opinion to repeat here all that was said there. Suffice it to say, we emphasized the broad and liberal construction that has been given to the statutory use of the word "crude," and cited, as illustrative of such usage, *Vandegrift & Co*. v. *United States*, 13 Ct. Cust. Appls. 30, T. D. 40865, and *G. D. Searle & Co*. v. *United States*, 21 Cust. Ct. 112, C. D. 1138.

The *Vandegrift & Co.* case, *supra*, related to dried and ground ovarian and pituitary cattle glands containing active ingredients used by drug manufacturers. After finding that such processes were essential for transportation of the glands to retain their therapeutic properties, the merchandise was held to be a crude drug within the provisions of paragraph 1669, *supra*.

The *Searle & Co.* case, *supra*, held concentrated ox gall used for treatment of biliary disorders and diseases of the biliary tract to be a crude drug, after a showing that the heating process applied in the country of exportation did no more than remove water from the fresh or green gall, and that the imported product contained no greater medicinal value than the raw material, existing in the gall bags of the livers of cattle.

What was said in these two cases, concerning the imported condition of the merchandise there involved, is equally applicable to the drug in question. The record before us establishes that the imported substance consisted of suprarenal glands that were first chopped or desiccated and then dried, that such processes in the country of exportation merely preserved the therapeutic property of the material for its medicinal use, and that they did not advance the merchandise in value or condition beyond that essential to proper packing and prevention of decay or deterioration pending manufacture.

The commodity is therefore a crude drug, entitled to free entry under paragraph 1669, *supra*, as claimed. Judgment will be rendered accordingly.