(C. D. 1350)

THOMPSON HAYWARD CHEMICAL CO. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided July 20, 1951)

*Philip Stein* (*Marjorie M. Shostak* of counsel) for the plaintiff.
*David N. Edelstein,* Assistant Attorney General (*Joseph E. Weil, John J. McDermott, Richard F. Weeks,* and *William J. Vitale,* special attorneys), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges

JOHNSON, Judge: This action involves the classification of certain merchandise invoiced as pyretoxin No. 18, a pyrethrum extract. It was in the form of a liquid. The collector assessed duty thereon at the rate of 20 per centum ad valorem under the provisions of paragraph 1558 of the Tariff Act of 1930 as a nonenumerated manufactured article. The plaintiff claims that the merchandise is dutiable at the rate of 10 per centum ad valorem under the provisions of paragraph 34, as a natural and uncompounded drug, advanced, or as pyrethrum flowers, natural and uncompounded, advanced, at the same rate of duty under paragraph 35, or at the same rate under paragraph 1558, as a nonenumerated unmanufactured article.

At the trial only one witness testified on behalf of the plaintiff. The Government did not call any witnesses. This witness had not seen the merchandise prepared in the country of production, which was Japan. Since he was neither a chemist nor a druggist, his statement that the imported product was prepared in the same manner as in the United States was given little weight in identifying the same. All the court had to rely upon was the report of the United States Customs Laboratory to the effect that the imported product was pyrethrum extract in a petroleum distillate. Upon such a state of facts, the court found that the merchandise was not natural and uncompounded, and therefore not classifiable under either paragraph 34 or 35, as claimed. The method of production not being shown, it was not established to be an unmanufactured article. Therefore, the assessment of the collector was upheld as being made under the proper classification. (See *Thompson Hayward Chemical Co.* v. *United States*, 16 Cust. Ct. 19, C. D. 978.)

Within the time prescribed by law, counsel for the plaintiff moved for a rehearing of the cause upon the ground that under the rules of the court, in force at the time of trial, the judge who heard the case upon circuit was required to write and participate in the decision. Inasmuch as that rule had been previously superseded without publication, and the case inadvertently had been sent to and decided by a judge of the third division to whom it had not been assigned, the motion was granted and the cause restored to the docket for all purposes.

When again coming on for trial, counsel for the plaintiff, under the rules of the court prevailing at the time of trial, moved for amendment of the protest, without objection, by the addition of the claims that the merchandise is free of duty under paragraph 1669, as inedible crude drugs, natural and uncompounded, not advanced in condition, or under paragraph 1602, as crude pyrethrum flowers, natural and uncompounded, not advanced in condition.

The paragraphs of the Tariff Act of 1930 (19 U. S. C. §§ 1001 and 1201), under which the merchandise was assessed and, such as are relied upon by the plaintiff, provide as follows:

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

PAR. 34. Drugs, such as * * * flowers, * * * and all other drugs of vegetable or animal origin; any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, 10 per centum ad valorem: *Provided*, That the term "drug" wherever used in this Act shall include only those substances having therapeutic or medicinal proper-

ties and chiefly used for medicinal purposes: *And provided further*, That no article containing alcohol shall be classified for duty under this paragraph.

PAR. 35. * * * pyrethrum or insect flowers; all the foregoing which are natural and uncompounded, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to proper packing and the prevention of decay or deterioration pending manufacture, 10 per centum ad valorem: *Provided*, That no article containing alcohol shall be classified for duty under this paragraph.

### TITLE II—FREE LIST

PAR. 1602. * * * pyrethrum or insect flowers, all the foregoing which are natural and uncompounded and are in a crude state, not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to proper packing and the prevention of decay or deterioration pending manufacture: *Provided*, That no article containing alcohol shall be admitted free of duty under this paragraph.

PAR. 1669. Drugs such as * * * flowers * * * and all other drugs of vegetable or animal origin; all the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, and are in a crude state, not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture: *Provided*, That no article containing alcohol shall be admitted free of duty under this paragraph.

Two witnesses testified on behalf of the plaintiff. The Government called no witnesses. George E. Beavers, the assistant chemist in the United States Customs Laboratory at the port of New Orleans, testified that he analyzed the merchandise at issue herein. The object of his analysis was to identify the pyrethrum in petroleum distillate. He testified that pyrethrum is a chemical compound and also that the petroleum distillate is a combination of chemical compounds. The compound extracted from the pyrethrum flower is chrysanthemum monocarboxylic acid, and consists of a chemical compound natural to the pyrethrum flower. The petroleum distillate used in the extraction process does not become a part of the chemical compound with the extracted pyrethrum and there is no chemical combination between the two compounds. They form merely a physical mixture and the pyrethrum had not become compounded.

Lindley S. De Atley, laboratory director and manager of the manufacturing department of the Thompson Hayward Chemical Co., a chemist, testified that his company manufactures drugs and industrial and agricultural chemicals. According to this witness, the bible of the pyrethrum industry is a book entitled "Pyrethrum Flowers" written by Dr. C. B. Gnadinger, general manager of one of the largest pyrethrum producers, and former chief of the Minneapolis Bureau of Chemistry of the United States Department of Agriculture. The book was marked in evidence as illustrative exhibit 2.

The witness identified the pyrethrum used in the chemical industry as a daisylike flower, and also the name of products prepared from that flower, and testified that it is known to the botanist as chrysanthemum cinerariaefolium, the principal variety used as a drug. According to this witness, there is a definite process used in extracting all soluble drug constituents from dry drugs, which is universal in its application, and that such method is described in illustrative exhibit 2. The witness was able to determine the manner of production of the extract from the nature of the ingredients present in "this crude natural extract that we obtained." He stated that it showed the amount of chlorophyll-type materials, the color-bearing materials, the waxes, oleoresins, and certain other natural constituents to be present. He testified that he examined all of the plaintiff's importations of pyrethrum in order to maintain the quality of the materials which the company processes from the crude material, and 'it is only by analyzing the crude materials that such maintenance of quality would be possible. When he ordered the merchandise in question, therefore, it was in accordance with specifications and as per sample furnished by the shipper for pyretoxin number 18.

From the witness' examination of pyretoxin number 18, he found it consisted of an extract from pyrethrum flowers, containing waxes, oleoresins, a great deal of coloring matter, pyrethrins I and II, and petroleum distillate; that the active principles of pyrethrum flowers, and of all the drugs derived from pyrethrum flowers, are principally pyrethrins I and II, which are two of the many chemical compounds present in pyrethrum extracts and in the flowers themselves. Like the previous witness, he was of the opinion that pyrethrins I and II are each, individually, chemical compounds, and that as present in the extract the pyrethrins have not been compounded with the petroleum distillate. It is only a mixture of chemical compounds.

The witness further testified that extraction by the percolation method consisted of circulating a liquid through a dry material to remove certain constituents that are soluble in the liquid; that the dried heads of the pyrethrum flowers are ground to about 30- or 40-mesh fineness and petroleum distillate is circulated as a solvent through this dry material, previously placed in a vessel which has a perforated or false bottom, the liquid being sprayed into the top; that it seeps down through the body of the dry material, then is pumped out of the bottom, and is recirculated by re-entrance at the top of the vessel; that by continuously circulating it, a point is finally reached where the extract is saturated with the extractable or soluble constituents of the pyrethrum flower. The resulting extract is not a compounding of the pyrethrum flower. Certain materials are merely removed from the pyrethrum flowers just as percolating coffee removes the essence

of the coffee from ground coffee. In the method of production, the only thing removed is the fibrous portion of the pyrethrum flower which is discarded.

In respect to the extract itself, the witness testified that the purpose of using petroleum distillate to obtain the pyrethrins from the flower is because of its solvent qualities, the pyrethrins being insolvable in water. Also, the distillate serves to exclude the oxygen of the air from the pyrethrins and thus acts as a preservative; that the petroleum distillate is not removed after importation for the reason that to remove it completely, temperatures would be required sufficient to decompose the pyrethrins and, consequently, the product would lose its value; that the petroleum distillate in and of itself has very little value as an insecticide; that insecticides, if they are of any value, kill above 90 per centum of flies, etc.; that in hundreds of tests run to determine the efficiency of various insecticides, pyrethrum meets that test, while petroleum distillate might kill only 4 or 5 per centum.

The witness testified further that the extract in question, in its condition as imported, is not usable as a drug but has to be further processed for its chief use in insecticides; that the importer has imported the dried pyrethrum flowers compressed into bales; that when received in that form, some of them have been very damp, some moldy, and some otherwise considerably deteriorated; and that the importer has imported pyrethrum only in the condition of dried flowers and as extracts, but the witness has seen it imported in the form of a very fine powder. In his experience, there was a distinct advantage in importing the material in the form of a liquid because, in the case of dried flowers, the potency at the time they reach the United States seldom compares with the potency at the time they left Japan, whereas when in extract form, there is no deterioration. When imported in liquid form, the pyrethrum extracts have been found to be very stable and are capable of being stored for months and years without appreciable decomposition. The flowers, on the other hand, deteriorate from 20 to 40 per centum in a few months.

The remaining important consideration for importing pyrethrum flowers in liquid form was on account of conserving shipping space and thus enabling such space to become more available. According to the witness, the extract diminishes the bulk, as it requires 71 pounds of flowers to make 1 gallon of extract, and a gallon weighs only 7 pounds.

The plaintiff contends that the merchandise is in a natural, uncompounded, and crude state, and has not been further advanced than essential to proper packing and the prevention of decay and deterioration pending manufacture, and that it is a condition contemplated by the identical language contained in paragraph 1669 or 1602, *supra*,

citing *United States* v. *Judson Sheldon Corp.*, 33 C. C. P. A. 73, C. A. D. 318; *G. D. Searle & Co.* v. *United States*, 21 Cust. Ct. 112, C. D. 1138; *Ciba Pharmaceutical Products, Inc.* v. *United States*, 21 Cust. Ct. 156, C. D. 1147; *Vandegrift & Co.* v. *United States*, 13 Ct. Cust. Appls. 30, T. D. 40865; *Biological Raw Products Co.* v. *United States*, 25 Cust. Ct. 1, C. D. 1253; *Dr. Halfdan Hebo* v. *United States*, 25 Cust. Ct. 93, C. D. 1270; *Geo. S. Bush & Co., Inc.* and *Robert E. Landweer* v. *United States*, 15 Cust. Ct. 83, C. D. 949.

The plaintiff further contends in the alternative that if the merchandise is held to be a drug in the advanced state, it is properly dutiable at the rate of 10 per centum ad valorem either as drugs, advanced, under paragraph 34, *supra*, or pyrethrum flowers, advanced, under paragraph 35, *supra*, citing *Synthetic Patents Co., Inc.* v. *United States*, 11 Cust. Ct. 147, C. D. 813; *Synthetic Patents Co., Inc.* v. *United States*, 12 Cust. Ct. 148, C. D. 845; *Atlantic Coast Fisheries Corp.* v. *United States*, 6 Cust. Ct. 415, C. D. 506; *D. C. Andrews & Co., Inc.* v. *United States*, 72 Treas. Dec. 383, T. D. 49190; *Geo. S. Bush & Co., Inc.* v. *United States*, 32 C. C. P. A. 56, C. A. D. 285; *Sherka Chemical Co., Inc.* v. *United States*, 33 C. C. P. A. 53, C. A. D. 316; and *Roche-Organon, Inc.* v. *United States*, 35 C. C. P. A. 99, C. A. D. 378.

The Government, on the other hand, contends that pyrethrum extract is not a drug, advanced, or pyrethrum flowers, advanced, as the proof before the court is still insufficient to establish the exact method of production of the imported merchandise; that first, it must be established that the product is natural and uncompounded, and second, whether the language in paragraphs 34 and 35, to wit, "advanced * * * by * * * any other process or treatment whatever," includes the percolation process allegedly used in the production of the imported merchandise. In that regard, it is argued that the mixture of chemical compounds, pyrethrin numbers I and II, together with the other hundreds of compounds in the product and the petroleum distillate, which itself is a complex mixture of aliphatic hydrocarbons, each of which is a chemical compound, is clearly a compound within the common meaning of that term. The fact that the importation is not pyrethrum flowers in a natural and uncompounded state, it is argued, is sufficient to keep it out of paragraph 35. But further, even if natural and uncompounded, it has been advanced in value and condition by a process dissimilar to that of shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to proper packing and the prevention of decay, as prescribed by the statute. It is argued in that regard that the language "any other process or treatment whatever" must be interpreted as restricted in meaning to matters of like kinds with "shredding, grinding, chipping, crushing," citing *Lehn & Fink* v. *United States*, 4 Ct.

Cust. Appls. 325, T. D. 33522, and *United States* v. *Stever*, 222 U. S. 167, 175.

The questions arising in this case are whether or not the pyrethrum extract is a drug, and then if it is in a natural and uncompounded condition. If it is a drug and in such condition, then it becomes necessary to determine whether it is in a crude state, not "advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture," or whether it is advanced in value or condition by shredding, grinding, etc. Upon the determination of these questions, we are confronted with the further question of whether or not the merchandise is more specifically provided for under the *eo nomine* provisions for pyrethrum or insect flowers than under the provisions for "Drugs, such as * * * flowers, * * * and all other drugs of vegetable or animal origin"; or whether the merchandise is in such an advanced state of manufacture that it is excluded from all paragraphs other than paragraph 1558, *supra.*

In the case of *United States* v. *Nagase et al.*, 11 Ct. Cust. Appls. 144, T. D. 38939, the appellate court found that merchandise consisting of the pulverized flowers of a pyrethrum plant was chiefly used as an ingredient in the preparation of insect powders, not in its imported state, however, but only after it had been compounded with other ingredients where pyrethrum supplied more than 50 per centum of the product in bulk; and that such pyrethrum flowers supplied to the compounded article its active or effective qualities, and the other ingredients served merely as carriers for it. Such pyrethrum flowers, pulverized, were held to be classifiable as drugs, advanced, under paragraph 27 (predecessor paragraph of the present paragraph 34) of the Tariff Act of 1913. In that act, there was no paragraph providing specifically for pyrethrum flowers.

The evidence submitted herein fully establishes that the imported merchandise was derived from pyrethrum flowers previously held to be a drug; that pyretoxin No. 18 has therapeutic properties and is chiefly used for medicinal purposes. The evidence also discloses that pyretoxin No. 18 contains chemical compounds natural to the flower, plus petroleum distillate, which is a combination of chemical compounds; that the natural pyrethrum compounds and the petroleum distillate compounds are in the extract as a physical mixture only; and that the pyrethrum compounds and petroleum distillate compounds therein did not constitute a compounded product.

In the case of *Atlantic Coast Fisheries Corp.* v. *United States*, 6 Cust. Ct. 415, C. D. 506, the merchandise imported consisted in part of fish-liver oil mixed with soya-bean oil and also with sesame oil. The fish

livers in the raw state were held to be drugs. It was contended that the product, composed of the extracted oils mixed with soya-bean oil and sesame oil, was drugs, advanced, dutiable under paragraph 34, *supra*. On the question of whether the extracts there were natural and uncompounded, the court stated:

On the question of whether the oils in issue are compounded drugs, witness Raynold testified that in his understanding as a chemist the mixed oils were not compounded, and it is observed that the term "compound" is defined in Funk & Wagnalls New Standard Dictionary as follows:

1. To make by the intermingling or intimate combination of various elements or ingredients; combine or intermix so as to form a composite product, as to *compound* an ointment; a character *compounded* of good and evil qualities.

2. To mix, combine, or put together (various ingredients, elements, or parts) to form a compound substance, word, or thing; as to *compound* drugs. [Italics quoted.]

Since it appears that the sesame or soya-bean oil mixed with certain of the fish-liver oil in question had no effect other than as agents assisting in the extraction of the oil from the livers and as preservatives of vitamin content of the oil so extracted, we are satisfied that the fish-liver oil so mixed was not compounded with the vegetable oils named so as to become a compounded drug excluded from classification under paragraph 34, and it is indisputable that the plain or crude fish-liver oil involved was not compounded.

In *Sherka Chemical Co., Inc.* v. *United States*, 33 C. C. P. A. 53, C. A. D. 316, the merchandise consisted of potassium oestradiol solution, described as alpha-oestradiol and beta-oestradiol in akaline solution. The source was the urine of pregnant mares, and oestrogenic hormones, including oestrone, were obtained by extraction with organic solvents. By recrystallization, the oestrone was largely separated from the other extracted substances. This oestrone was then dissolved in potassium hydroxide and reduced to the original oestradiol form. This solution was the imported product, but was not suitable in its imported condition for administration. After importation, the various hormones were removed from the potassium hydroxide solution. The appellate court held the product to be natural and uncompounded and classifiable as a drug, advanced in condition, under the provisions of paragraph 34, *supra*. In its decision, the court quoted the *Atlantic Coast Fisheries Corp.* case, *supra*, noting that this court had held the fish-oil extracts therein properly classifiable under paragraph 34, as drugs, advanced. In both of the foregoing decisions, the fish livers as well as the urine of the pregnant mares were considered as drugs. The extracts were considered to be advanced drugs.

In the case of *Lehn & Fink* v. *United States*, 4 Ct. Cust. Appls. 325, T. D. 33522, the certain extracts of gentian and of taraxacum were claimed dutiable under the drug paragraph as then appearing in the Tariff Act of 1909. The extract of gentian was a dry powder, made

by extracting the gentian root with water and evaporating the solution to dryness and powdering it. The extract of taraxacum was a dry powder obtained by evaporating the juices of the dandelion root. The drug paragraph under the Tariff Act of 1909 provided in paragraph 20 for certain drugs of vegetable origin, including dried insects and woods expressly used for dyeing or tanning, but restricted the paragraph to "any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for in this section, but which are advanced in value or condition by any process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture." The court construed the language "advanced in value or condition by any process or treatment whatever" as not comprehensive enough to include within its terms such natural drugs as had been so advanced by being in the form of infusions, decoctions, and extracts as to lose the physical properties and distinguishing characteristics of roots, berries, flowers, etc.

The drug paragraphs of the Tariff Act of 1930, *supra*, it will be observed, now provide not only for specifically named natural products such as barks, beans, flowers, etc., but also for "*all other drugs of vegetable or animal origin.*" [Italics supplied.] Paragraph 34, *supra*, unlike the drug paragraph of the Tariff Act of 1909, also specifies certain of the treatment which shall be considered to advance the value, to wit, "by shredding, grinding, chipping, crushing," before adding the words "or any other process or treatment whatever," etc. Thus, Congress made it clear that processes of advancement need not be restricted to such as would not destroy the physical characteristics of the natural drug.

In view of the language of the paragraph now in question, it is abundantly clear that in providing for drugs of vegetable or animal *origin*, the Congress intended that the word "natural" should be construed as indicating the source in contradistinction to a synthetic decoction.

The argument of Government counsel that the merchandise is excluded from the paragraphs of the law in question for the reason that the advancement is by a process "dissimilar to that of shredding, grinding, chipping, crushing" and that the language "any other process or treatment whatever," must be interpreted as restricted in meaning to matters of like kinds with "shredding, grinding, chipping, crushing," in accordance with the holding of the court in the *Lehn & Fink* case, *supra*, for the reasons heretofore set out, are clearly without merit.

From the uncontradicted evidence submitted in this case, and in view of the foregoing decisions, we are of opinion that the pyrethrum

flowers constitute a drug, and that in the form imported it is in a natural and uncompounded state. Counsel for both sides have admitted that it contains no alcohol and that it is inedible. It would further indicate from a consideration of the *Nagase* case, *supra*, and the *Atlantic Coast Fisheries Corp.* case, *supra*, that the imported product in question is within the terms of a drug or pyrethrum flowers, advanced in condition, rather than crude, inasmuch as the *Nagase* case dealt with pulverized pyrethrum flowers, which were held to be drugs in an advanced state, and the *Atlantic Coast Fisheries Corp.* case, with extracts of drugs which were also held to be in an advanced state.

Counsel for the plaintff, however, has cited many decisions in an effort to sustain his position that the drugs in question are in a crude condition. The court has carefully considered all of the cases cited and will distinguish them as briefly as such an involved subject will permit. We note that in the *Judson Sheldon* case, *supra*, the imported extract was obtained by grinding crude raw or frozen beef livers and washing out the water soluble portions and concentrating such material. The court observed, "The livers from which the instant extract was taken were not crude drugs." The crude drug in that case emanated from an edible beef liver and that is why the extract was found not to have been advanced beyond its crudest, simplest state. The court distinguished the case of *Geo. S. Bush & Co., Inc.* v. *United States*, 32 C. C. P. A. 56, C. A. D. 285, where the crude state of the drug was the liver, and the extracted oil was consequently an advanced drug, as crushing the livers to destruction and subsequently applying heating and purifying processes to the macerated material removed the therapeutic substance, vitamin A, from its crude state to an advanced state. In the *Searle* case, *supra*, the ox gall was the drug, but the advancement thereon merely concentrated it down to 25 per centum moisture. All the ingredients natural to the substance remained intact. In the *Ciba* case, *supra*, there was no drug brought into being until the process was undertaken to produce the blood platelets, which were found to be the drugs, and in the form of these platelets, the product was in the crudest form possible to ship. In the *Vandegrift* case, *supra*, certain cattle glands and organs were dried and ground into powdered form. The drying and grinding were established as essential in the preparation of the drugs to prevent their decay or deterioration pending manufacture for their medicinal uses. Therefore, the court found the product to be a drug in a crude state, although the glands and different organs were the natural and uncompounded nonedible drugs of animal origin. The drying and grinding were established to be only for the purpose of transportation and preservation. In the *Biological Raw Products Co.* case, *supra*, the court followed the principle in the *Vandegrift* and *Searle* cases, *supra*, where

the crude material was a drug, and the drying was merely for safety in transportation. There, the drying was in fact a detriment to the extraction of the valuable medical ingredients. In the *Hebo* case, *supra*, the merchandise consisted of suprarenal glands described as "a little appendix at the kidney of beef cattle and hogs." These glands were put through an ordinary meat chopper and then dehydrated in an oven. During the course of dehydration, a fatty layer, surrounding the material, is removed, exposing the gland to air that facilitates drying and creates a condition for proper preservation of the substance. The Government claimed that the importation was an advanced drug, based upon the assumption that these suprarenal glands were subjected to a grinding process following dissection and dehydration. The court held the glands to be the drugs, but it was established to the satisfaction of the court that processes to which the glands were subjected were merely for the preservation of the therapeutic properties thereof and did not advance the product beyond that essential to proper packing and prevention of decay or deterioration pending manufacture. Therefore, it was held to be a crude drug. In the case of *Geo. S. Bush & Co., Inc., et al.* v. *United States*, 15 Cust. Ct. 83, C. D. 949, the merchandise, dogfish livers, was identical with the merchandise in the case of *Geo. S. Bush & Co., Inc.* v. *United States*, 32 C. C. P. A. 56, C. A. D. 285, *supra*, but in C. D 949 it was established to the satisfaction of the court that removing the vitamin content from the dogfish livers and dissolving it in oil did not advance the drug in value or condition beyond that contemplated by paragraph 1669, *supra*, for the reason that it was established there was no known way of shipping the natural dogfish livers without attendant decay or deterioration and consequent loss of vitamin A; that cooking the livers for preservation during the period of transportation would "destroy a large portion of the vitamin content"; and that macerating the livers to acquire the imported oil saves vitamin content.

It will be seen, therefore, that unless it has been established that the pyrethrum extract in question was not a process or treatment beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, such extract is properly classifiable as being advanced rather than in a crude condition. The pyrethrum flowers in the natural state are dried flowers. The product has been imported in that form. True, there was evidence of some deterioration when so imported but there is no showing that the deterioration was to such an extent when so imported that it became commercially unprofitable, or that the effectiveness of the drug was lost. Pyrethrum flowers in a ground state have been held to be in an advanced condition rather than crude. In fact, paragraph 1602 expressly excludes pyrethrum flowers advanced by shredding, grind-

ing, chipping, or crushing, and the pyrethrum flowers, in preparing the extract in question, first had to be ground to 30- or 40-mesh fineness. The fact that the extract is one step further advanced than grinding would tend to directly place it in the advanced class rather than remove it from that class. It is the opinion of this court, therefore, that the product in question is advanced in value or condition beyond that essential to the proper packing and the prevention of decay or deterioration pending manufacture.

The remaining question for consideration is whether the merchandise is classifiable as a drug, advanced, or under the provision for pyrethrum flowers, advanced. Were it not for the provisions of paragraph 35, pyrethrum flowers, advanced in value by any process or treatment whatever, would be dutiable as drugs, advanced, under paragraph 34. Inasmuch as the books are replete with decisions holding that extracts are a form of drugs, advanced in condition, and the provision for pyrethrum flowers, advanced, is in identical language as the paragraph covering drugs, advanced, we are of the opinion that the *eo nomine* provision for pyrethrum flowers, advanced, is more specific than the provision for drugs, advanced. It is the holding of the court, therefore, that the merchandise is properly dutiable at the rate of 10 per centum ad valorem under the *eo nomine* provision in paragraph 35 of the Tariff Act of 1930. In all other respects the protests are overruled.